(C. D. 1300)

T. M. DUCHE & SONS *v.* UNITED STATES

## United States Customs Court, Third Division

(Decided February 14, 1951)

*Barnes, Richardson & Colburn* (*Albert MacC. Barnes of* counsel); and *Oscar E. Bland,* associate counsel; for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., dissenting

EKWALL, Judge: The issues in this case have been before this court and the Court of Customs and Patent Appeals on numerous occasions. Plaintiff imported from China a quantity of dried egg yolk and dried egg albumen upon which duty was assessed at the rate of 27 cents per pound under the provisions of paragraph 713 of the Tariff Act of 1930, as modified by Presidential proclamation, T. D. 44997, issued under authority of section 336 of said tariff act. It is claimed on behalf of the plaintiff that said Presidential proclamation is illegal, null, and void, because, it is alleged, it is based upon a report of the Tariff Commission which shows on its face that there was no legal compliance with the jurisdictional requirements of said section 336. This claim is based upon the following allegations as set forth in plaintiff's brief:

(a) There was no *domestic article* as defined in Section 336;

(b) There was no commercial production from which costs of production, as defined in Section 336, could be ascertained;

(c) No domestic costs of production as defined in Section 336 were obtained;

(d) The domestic costs of production found by the Tariff Commission were *estimated* and not actual;

(e) The Tariff Commission used an alternative basis for domestic costs when Section 336 definitely provides for only one method;

(f) The action of the President was illegal beyond the law, and void because he assumed the non-delegated power to protect by tariff rates a non-existent domestic article and industry.

Plaintiff specifically claims that the merchandise is properly dutiable at 18 cents per pound under the same paragraph as originally enacted.

The case has been submitted upon a stipulation that the record in the case of *T. M. Duche & Sons, Inc.* v. *United States,* 36 C. C. P. A. (Customs) 19, C. A. D. 391, may be incorporated. The record in the incorporated case consisted of the record in the case of *T. M. Duche & Sons, Inc.* v. *United States,* 13 Cust. Ct. 26, C. D. 863, which was not appealed, and which in turn included the record in the case of *David L. Moss Co., Inc.* v. *United States,* 26 C. C. P. A. (Customs) 381, C. A. D. 45. In the earlier *Duche* case, reported in 13 Cust. Ct., *supra,* this court overruled plaintiff's claims under authority of *United States* v. *George S. Bush & Co., Inc.,* 310 U. S. 371. In the later

*Duche* case, decided by our appellate court in 36 C. C. P. A., *supra*, the court upheld the majority opinion of this court reported in *T. M. Duche & Sons, Inc.* v. *United States*, 18 Cust. Ct. 25, C. D. 1040, and held that the case of *United States* v. *George S. Bush & Co., Inc.*, *supra*, was controlling of the issue and that under that decision, this court and our appellate court may not review the facts which appear in the record of the hearing before the Tariff Commission, but the courts may examine judicially the factual record to determine whether there has been compliance with the jurisdictional and statutory requirements. The court further held that section 336, *supra*, does not necessarily presuppose the existence of a competitive industry in order to lend validity to the investigation by the Tariff Commission. In arriving at its conclusion, the court took occasion to quote from the reasoning of Justice Douglas in the *Bush* case, *supra*, as follows:

> The powers which Congress has entrusted to the President under the Act of 1930 do not essentially differ in kind from those which have been granted him under the tariff acts for well over a century. See *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 308 *et seq.*, for a review of the statutes. Since its creation in 1916 the Commission has acted as an adviser to the Congress or to the President. Under § 336 of the Act of 1930 the Commission serves the President in that role. It does not increase or decrease the rates of duty; it is but the expert body which investigates and submits the facts and its recommendations to the President. It is the judgment of the President on those facts which is determinative of whether or not the recommended rates will be promulgated. In substance and to a great extent in form (*Norwegian Nitrogen Products Co.* v. *United States, supra*) the action of the Commission and the President is but one stage of the legislative process. *Hampton & Co.* v. *United States*, 276 U. S. 394. "No one has a legal right to the maintenance of an existing rate or duty." *Norwegian Nitrogen Products Co.* v. *United States, supra*, p. 318. And the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment. It has long been held that where' Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review. *Martin* v. *Mott*, 12 Wheat. 19; *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177; *Dakota Central Telephone Co.* v. *South Dakota*, 250 U. S. 163; *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1. As stated by Mr. Justice Story in *Martin* v. *Mott, supra*, pp. 31–32: "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."
>
> For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains. Under the Constitution it is exclusively for Congress, or those to whom it delegates authority, to determine what tariffs shall be imposed. * * *

Counsel for the plaintiff in the brief filed makes the following statements as to the issue:

In asking the court to review again this question it should be made clear that plaintiff is not asking a review of the factual findings and conclusions of the Commission nor is he asking the court to "weigh the evidence" before the Commission nor to "substitute its opinion or discretion for that of the Commission" or the President. Instead, the protest is based upon the claim that there is no validity in the entire proceedings of the Commission and President; that the Commission has exceeded the power conferred upon it and its investigation and findings and the proclamation of the President based thereon are illegal because of failure to satisfy express jurisdictional requirements of the statute.

The jurisdictional requirements of the statute above referred to were passed upon in the *Duche* case reported in 36 C. C. P. A., *supra*, insofar as the provisions of the Tariff Act of 1930 are concerned. The only new element injected into the case by the present proceedings is the applicability of the Administrative Procedure Act, 5 U. S. C. A. § 1001 *et seq.* Section 1009 of that act contains the following provisions:

### § 1009.   Judicial review of agency action

Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion.

### Rights of review

(a)   Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

It is the opinion of the court and we so hold, that unless the Administrative Procedure Act, *supra*, is applicable, the issues here presented are *stare decisis*. Whether or not the rule of *stare decisis* shall be followed or departed from, is a question entirely within the discretion of the court when called upon to consider a question once decided. *Hertz* v. *Woodman*, 218 U. S. 205; 54 L. ed. 1001.

The primary purpose of said act, as shown by the legislative history thereof (House Report No. 1980, May 3, 1946, United States Code Congressional Service, 79th Congress, 2d Session, p. 1195 *et seq.*), was to secure judicial review of administrative agencies. In discussing the substance of the bill which was enacted as the Administrative Procedure Act, the report states:

What the bill does in substance may be summarized under four headings: 1.   It provides that agencies must issue as rules certain specified information as to their organization and procedure, and also make available other materials of administrative law (sec. 3).   2.   It states the essentials of the several forms of administrative proceedings (secs. 4, 5, and 6) and the general limitations on administrative powers (sec. 9).   3.   It provides in more detail the requirements for administrative hearings and decisions in cases in which statutes require such hearings (secs. 7 and 8).   4.   It sets forth a simplified statement of judicial review deisgned to afford a remedy for every legal wrong (sec. 10).

It is noted that the act in question took effect in September 1946. The Presidential proclamation here involved is effective July 24, 1931, the instant entries were made during 1936, and liquidation was made

in 1937. The act expressly exempts Congress from its operation. It defines "agency" as follows:

### § 1001. Definitions

As used in this chapter—

#### Agency

(a) "Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this chapter shall be construed to repeal delegations of authority as provided by law. * * *

It is clear that this provision merely states the obvious, viz, that Congress, the courts, and the governments of the possessions are not federal "administrative" agencies, and that the act is not to impinge upon any branch of the Government except the executive.

That the President, acting under the flexible tariff statute, cannot be regarded as an administrative agency, but is an agent of Congress, has been held by this court, the Court of Customs and Patent Appeals, and the United States Supreme Court. *Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394, 411, affirming *Same* v. *Same,* 14 Ct. Cust. Appls. 350, T. D. 42030. There, the Court, speaking through Mr. Chief Justice Taft, used the following language:

* * * What the President was required to do was merely in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect.

See also the statement of Mr. Justice Cardozo in *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, at 305:

* * * What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process. *Hampton & Co.* v. *United States,* 276 U. S. 394; *Buttfield* v. *Stranahan, supra; Field* v. *Clark,* 143 U. S. 649. * * *

In the light of these rulings the President and the Tariff Commission are excluded from the operation of the Administrative Procedure Act.

Moreover, it has been held that the provision of said subsection (a) above, that any person suffering legal wrong because of any agency action shall be entitled to judicial review thereof and that every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review, is merely declaratory of existing law of judicial review, and it neither confers jurisdiction on the district court above and beyond that which it already had, nor grants to aggrieved parties any rights they did not have under the National Labor Relations Act. *Olin Industries* v. *National Labor Relations Board,* 72 Fed. Supp. 225. We think this holding is equally applicable in the instant case, and that the subsection neither grants to this court jurisdiction above and beyond that which it already had,

nor grants to aggrieved parties any rights they did not have under the tariff act.

In the case of *Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.*, 333 U. S. 103, the question for determination was whether the courts had jurisdiction of the action of the Civil Aeronautics Board denying the application of the steamship company for a certificate of convenience and necessity for an air route. The provisions of law there involved governing common carriers by air required that all applications for a certificate to engage in any overseas or foreign air transportation be transmitted to the President and all decisions thereon by the Civil Aeronautics Board be approved by him. The statute did not provide for any judicial review of action on such application, and the question for determination by the court was whether such action was impliedly exempted from such judicial review. The Supreme Court held that the orders of the Board are not mature and, therefore, are not susceptible of judicial review until they are made final by Presidential approval, and, further, that after such approval has been given, the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate. In the course of its decision, the Court said:

> This Court long has held that statutes which employ broad terms to confer power of judicial review are not always to be read literally. Where Congress has authorized review of "any order" or used other equally inclusive terms, courts have declined the opportunity to magnify their jurisdiction, by self-denying constructions which do not subject to judicial control orders which, from their nature, from the context of the Act, or from the relation of judicial power to the subject-matter, are inappropriate for review. Examples are set forth by Chief Justice Hughes in *Federal Power Commission* v. *Edison Co.*, 304 U. S. 375, 384. *Cf. Rochester Telephone Corp.* v. *United States*, 307 U. S. 125, 130.

We deem it unnecessary to review in detail all of the earlier decisions on the issues here presented; that has been done by this court and the Court of Customs and Patent Appeals and also the Supreme Court in the decisions above cited. We have given full and careful examination to the issues, having in mind that courts upon whom the public must rely for the establishment and maintenance of correct legal principles, should not hesitate, when convinced of error, to reverse their decisions and enunciate the principles which more complete information and more mature consideration lead them to conclude are correct and sound. However, we are unable to find in the instant case that the conclusions reached in the later *Duche* case, decided in 36 C. C. P. A., *supra*, were anything but correct and sound. We therefore hold that the issue is *stare decisis*, and overrule plaintiff's protest.

Judgment will be rendered accordingly.

CLINE, Judge: I regret that I am unable to agree with my associates that the protest in this case should be overruled.

The questions here involved have been before the courts on several previous occasions. *David L. Moss Co., Inc.* v. *United States*, 71 Treas. Dec. 825, T. D. 48985, affirmed by a divided court and for different reasons in *Same* v. *Same*, 26 C. C. P. A. 381, C. A. D. 45; *T. M. Duche & Sons* v. *United States*, 13 Cust. Ct. 26, C. D. 863; *T. M. Duche & Sons, Inc.* v. *United States*, 18 Cust. Ct. 25, C. D. 1040, affirmed in *Same* v. *Same*, 36 C. C. P. A. 19, C. A. D. 391, certiorari denied, 336 U. S. 931.

The present case has been submitted on the record in *T. M. Duche & Sons, Inc.* v. *United States*, 36 C. C. P. A. 19, C. A. D. 391. That case was submitted on the record in *T. M. Duche & Sons* v. *United States*, 13 Cust. Ct. 26, C. D. 863, which record included the record in *David L. Moss Co., Inc.* v. *United States*, *supra*, and two other documents.

The protests in each of the cited cases were overruled on the ground that the courts had no authority to review the findings of the Tariff Commission or to disturb the conclusions of the President based thereon.

This case has been submitted on the following documents:

Exhibit 1—Copy of Senate Resolution 389, 71st Congress, Third Session, directing the Tariff Commission to investigate the differences in costs of production of dried whole eggs, dried egg yolk, and dried egg albumen under section 336.

Exhibit 2—Copy of public notice of investigation issued by the Tariff Commission.

Exhibit 3—Copy of testimony taken at the public hearing held by the Tariff Commission.

Exhibit 4—Photostatic copies of the documentary exhibits introduced in the Tariff Commission investigation.

Exhibit 5—Photostatic copies of depositions taken of witnesses not in attendance at the public hearing.

Exhibit 6—Report of the Tariff Commission, No. 25, entitled "Report to the President on Dried Egg Products."

Plaintiff contends that the case of *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, is not controlling; that the courts possess jurisdiction to examine the facts upon which Presidential action under section 336 of the Tariff Act of 1930 is based to determine whether its requirements have been met; that a judicial review of the proceedings before the Tariff Commission to determine if the prerequisites to the valid issuance of a Presidential proclamation under section 336 have been complied with is guaranteed by the Administrative Procedure Act, 5 U. S. C. § 1001 *et seq.*; that full compliance with the specific requirements of section 336, including commercial production of a

domestic article for which a cost of production exists, is a legal requisite to a valid proclamation; that the legislative history of section 336 indicates that Congress intended it to be applied only to domestic articles commercially produced in the United States; that there was no commercial production of dried egg albumen during the period covered by the Commission's investigation, and the attempted change in duty was based upon estimated costs of production for related products; that the Presidential proclamation is invalid for failure to comply with the jurisdictional requirements of the statute; and that the American selling price provision of section 336 cannot be applied unless the term "domestic article" means one commercially produced and marketed.

Defendant contends that the decision of *T. M. Duche & Sons, Inc.* v. *United States*, 36 C. C. P. A. 19, C. A. D. 391, is *stare decisis* of the case at bar and that the Administrative Procedure Act is not applicable.

In *T. M. Duche & Sons, Inc.* v. *United States, supra*, the court held that it did not possess the power "to *judicially examine the factual record* upon which the President's action is based to determine whether there has been compliance with the jurisdictional and statutory requirements which limit their exercise of delegated power" [italics the court's]; that *United States* v. *George S. Bush & Co., Inc., supra*, was controlling of the issue; that the scope of appellate jurisdiction in sections 501 and 514, Tariff Act of 1930, does not permit judicial examination of the judgment of the President. The court said further (p. 24):

We are of opinion that a fair reading of section 336 does not *necessarily* presuppose the existence of a *competitive* domestic industry in order to lend validity to an investigation by the Tariff Commission. [Emphasis supplied.]

It is plaintiff's claim that in the instant case there was *no commercial production* of dried egg albumen and that the domestic cost of production which was compared with the foreign cost of production was based upon *estimated* costs of producing related articles, such as frozen eggs and frozen egg albumen.

The Tariff Act of 1930 was enacted in part to encourage the industries of the United States, but not to create new ones. Therefore, the existence of a domestic industry must be a prerequisite to the operation of the flexible tariff provisions of section 336. It authorizes changes in rates only when necessary to equalize the differences in costs of production of like or similar domestic and foreign articles. The cost of production of a domestic article is defined to include the cost of materials and labor and the usual general expenses incurred in the production of the article, the costs of containers and coverings incident to placing the article in condition packed ready for delivery, the transportation costs incident to delivery to the principal market or markets in the United States, and other relevant factors constitut-

ing an advantage or disadvantage in competition. Certainly, "transportation costs and other costs incident to delivery to the principal market or markets of the United States for the article" (section 336 (e) (2)) must refer to an article which is produced commercially, and not to one produced experimentally or spasmodically since there would be no established market or markets for such an article and no transportation costs could be calculated.

Subsection (b) of section 336 provides that if the Tariff Commission finds that foreign and domestic costs of production cannot be equalized by increasing or decreasing a rate of duty within the limitations of subsection (a), it shall specify such ad valorem rate based upon the American selling price of the domestic article as it finds necessary to equalize such differences. The American selling price of an article is defined in section 402 (g) as "the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market." Where there is no commercial production of an article, it could not be freely offered for sale in the *ordinary* course of trade and in the *usual wholesale* quantities.

In *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698, it was held that the American selling price provisions of the Tariff Act of 1922 could not be applied where there was no substantial evidence to support a finding that the domestic article was freely offered for sale to all purchasers at the time of exportation of the imported merchandise. The court said (p. 185):

To establish the price which the producer would have received or was willing to receive it must at least appear that he had something to sell at that price, and also that he had or could produce enough to sell, so that more than two small orders could be filled without exhausting the supply, in a case where the demand was as great as in this case. If this is not so, the mere declaration of a possible producer that he was willing to sell at a named price would enable him to compel an appraisal at a value which did not then exist and might never obtain. In other words, without having anything to sell, without knowing what it would cost to produce the article, he could by mere fiat control, to some extent, at least, the course of commerce.

It is clear, therefore, that the American selling price provisions cannot be applied to an article not commercially produced nor could the Tariff Commission make any findings under section 336 (b). Since section 336 (b) contemplates a domestic article which is commercially produced and since there is no different definition of "domestic article" in section 336 (a), the "domestic article" contemplated in that section must also be one which is in commercial production.

This view is supported by the legislative history of the provision.

When this provision was before the Senate, Senator Smoot, chairman of the Senate Finance Committee, stated (Congressional Record, 71st Cong., 1st sess., vol. 71, part IV, p. 3909):

The Congress, in adopting the flexible tariff system to meet the changing tariff situations just described, placed upon the President of the United States the duty of determining the adjustments in tariff rates (within the prescribed limitations) necessary to equalize the costs of production between domestic and foreign *industry*. [Emphasis supplied.]

When tariff revision was being contemplated by the Congress in 1929, the Tariff Commission submitted a report to the Chairman of the Ways and Means Committee of the House, setting forth certain difficulties encountered in administering the flexible tariff provisions of the Tariff Act of 1922. (Tariff Readjustment—1929, Hearings before the Committee on Ways and Means, House of Representatives, 70th Congress, 2d Session, vol. 17, p. 10657 *et seq*.) It was pointed out that a number of investigations had been suspended for various reasons, including lack of domestic and foreign production for which costs could be calculated. The report also stated (p. 10659):

An extreme case of the difficulties of comparability is that in which there is no domestic production of articles exactly similar to the imports. In such cases the principle of the differences in cost of production can not apply. *It is not assumed that the flexible provisions should be so interpreted as to create an entirely new domestic industry*, * * * . [Emphasis supplied.]

The Tariff Commission therefore proposed a change in the flexible tariff provisions to provide that whenever the President is satisfied that a change in duty is necessary to offset the differences in conditions of competition with respect to *some related article*, he shall make such change in the duty on such related article as is shown to be necessary to offset the differences in conditions of competition with respect to the article. Congress, however, did not adopt this suggested provision.

In view of this legislative history and the express provisions of section 336, any action by the President in a case where no domestic industry exists or where the article is not commercially produced is beyond the scope of the authority delegated to him and is subject to judicial review. In *Hampton, Jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T. D. 42030 (affirmed 276 U. S. 394), the court said (p. 369):

But when, in the performance of his duties, under this section, the President proclaims a change of duty, if, in so doing, he acts beyond the law or fails to comply with its express mandates, then we can not doubt that the person aggrieved thereby may find adequate relief in the courts. We need not go beyond the case at bar for an illustration of this. Here the importer has protested against the imposition of additional duties because of the alleged unconstitutionality of the act under which it was imposed, and upon that claim he is entitled to a proper hearing in the courts. Can it be denied that if, in the imposi-

tion of this rate of duty, the President had proceeded without taking the steps directed by section 315, the importer could have set these facts out in his protest and had an adjudication thereon? To deny this would be to give to the act of the President a peculiar sanctity and inviolability not attaching to the acts of other officials of the Government performing similar fact-finding duties; and this we are neither called upon to do nor justified by the law in doing. We are unable to see why any different rule of law should be applied to the President's finding of facts under section 315 than the one applied to the finding of valuation by an appraiser of merchandise at our ports. In such cases, while the courts have held the finding of valuation made by the appraiser to be conclusive, if he proceeds upon a wrong principle, contrary to law, his acts are subject to judicial control and correction. *Badger* v. *Cusimano*, 130 U. S. 39; *Robertson* v. *Frank Bros. Co.*, 132 U. S. 17 (24); *Muser* v. *Magone*, 155 U. S. 240 (247); *United States* v. *Passavant*, 169 U. S. 16 (21).

Section 336 lays down the principle that rates of duty may be changed by the President only where necessary to equalize the costs of production of domestic and foreign articles. Therefore, should the President proclaim a change which is unnecessary because there are no differences in costs of production or because no domestic article was commercially produced with which a comparison could be made, his action would be based upon a wrong principle and subject to judicial control and correction.

In *United States* v. *George S. Bush & Co., Inc., supra*, it was held that, since section 336 contained no provision concerning the conversion of currency, the President's method of conversion was not subject to judicial review; that section 501 of the Tariff Act of 1930 did not confer jurisdiction to examine the judgment of the President that the rates of duty recommended by the Tariff Commission were necessary to equalize the differences in foreign and domestic costs of production; and that the judgment of the President based upon facts found in accordance with a procedure prescribed by Congress was not subject to judicial review.

The instant case, however, involves the question of whether or not there was a domestic article whose costs of production could be compared with those of a similar foreign article. If no such domestic article existed, the President would have no authority to act. Therefore, the question is a jurisdictional one and is subject to judicial review.

Moreover, the Administrative Procedure Act (5 U. S. C. 1001 *et seq.*) provides that any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action, shall be entitled to judicial review thereof except so far as statutes preclude judicial review or agency action is by law committed to agency discretion. This act became effective 3 months after June 11, 1946, while the Presidential proclamation here involved is effective July 24, 1931, and the entries were made in 1936. However, it has been held that the provisions on judicial review in effect at the time of the hear-

ing are applicable although the agency action occurred prior to the effective date of the act. *National Labor Relations Board* v. *Thompson Products, Inc.*, 162 F. 2d 287.

There is no provision of law which precludes judicial review of the action of the President and the Tariff Commission, and, as I have shown above, the question here involved is jurisdictional and is therefore not committed to the discretion of the President. The provisions of the Administrative Procedure Act granting judicial review of agency action are applicable to the case at bar.

In order to determine whether there was substantial evidence before the Tariff Commission upon which to base its findings, I turn now to the report of the Commission and the evidence submitted to it. It appears therefrom that from 1918 until 1927 there was only an occasional, experimental production of dried egg products in this country; that in 1927, two companies dried whole eggs and egg yolks; that in 1929, one company tray-dried about 100,000 pounds of liquid whites, partly to salvage them; that in 1931, another company experimentally produced some dried eggs; and that a few other firms had dried egg albumen experimentally. The report of the Tariff Commission states (p. 7):

The commercial production of dried eggs in the United States ceased after 1916. In 1927 deliveries from China were interrupted by civil war. The prices of shell eggs in this country were then quite low, and two domestic plants dried several hundred thousand pounds of whole eggs and yolks. These two plants operated again for a short time in 1930, when domestic shell eggs sold for less than in 1927, and again for a brief period in 1931, when prices were still lower. The output of dried eggs at all times was very small as compared with imports and was insignificant as compared with the domestic production of frozen eggs or of shell eggs. There are, however, a large number of milk-drying plants in the United States, a majority of them in the chief egg surplus region, and they can be readily adapted to the drying of eggs. But because of the low prices at which imported egg products have been available, there has been little incentive for these plants to engage in egg drying.

There is no evidence in the record that any milk-drying plants were actually producing dried eggs.

In computing the cost of production of dried egg products, the Tariff Commission reported that it used the actual costs of drying obtained from plants that were engaged in that business, but that in respect to raw materials, it used the weighted average of farm and central market prices of breaking-stock eggs delivered at *freezing* plants.

On the record herein, I find that there was no domestic dried egg albumen industry in the United States during the years 1928 to 1930 and that the only production of such merchandise was on an experimental basis. In my opinion, therefore, the Presidential proclamation, effective July 24, 1931, is illegal and void insofar as it purports to increase the rate of duty on dried egg albumen from 18 cents per pound

to 27 cents per pound. The protest should be sustained and the merchandise held subject to duty at 18 cents per pound under paragraph 713 of the Tariff Act of 1930.