(C. D. 1547)

METROPOLITAN PETROLEUM CORP.
HERBERT B. MOLLER } *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 6, 1953)

*Sharretts, Paley & Carter* (*Howard C. Carter, Joseph F. Donohue,* and *Louis J. Paley* of counsel) for the plaintiffs.

*Warren E. Burger,* Assistant Attorney General (*Arthur R. Martoccia,* special attorney), for the defendant.

Before OLIVER, MOLLISON, and FORD, Judges

MOLLISON, Judge: On or about October 27, 1951, the plaintiffs herein imported into the United States from Curacao, Netherlands West Indies, via the subport of Jacksonville, Fla., a cargo consisting of some 2,545,333 gallons of a commodity described on the invoice as "FUELOIL." The oil was accorded free entry under the provisions of paragraph 1733 of the Tariff Act of 1930, but the collector of customs assessed tax or duty at the rate of ½ cent per gallon on the said oil under the provisions of section 3422 of the Internal Revenue Code (26 U. S. C.), which imposed such rate of duty upon "fuel oil derived from petroleum," by virtue of the Presidential proclamation reported in T. D. 52559.

By their protest and timely amendment thereof the plaintiffs herein claim that the assessment of tax or duty at the said rate of ½ cent per gallon was unlawful and that the lawful rate of tax on such petroleum fuel oil was ¼ cent per gallon under the provisions of said section 3422 of the Internal Revenue Code, as amended by the trade agreement with Mexico, reported in T. D. 50797. It is claimed that the said rate of ¼ cent per gallon was the rate of duty existing on January 1, 1945, and that the proclamation of the President of the United States reported in T. D. 52559 "purporting to terminate his proclamations

of December 28 and 31, 1942 [reported in T. D. 50797], is ultra vires, illegal, null and void to the extent that it violates section 350 (a) (2) of the Tariff Act of 1930, as amended."

Other alternative claims are made in the protest but were abandoned.

On behalf of the defendant, it is contended that the Presidential proclamations putting into effect the provisions of the Mexican Trade Agreement, which became effective January 30, 1943, were terminated by the Presidential proclamation reported in T. D. 52559, effective December 31, 1950, and that the said terminating proclamation was in all respects legal.

The parties do not dispute the sequence of events which preceded the imposition of the tax in question. In a series of revenue acts, ultimately codified as part of the Internal Revenue Code (26 U. S. C.), Congress imposed a tax upon imported crude petroleum and certain petroleum products, including fuel oil derived from petroleum, of ½ cent per gallon (26 U. S. C. §§ 3420–3422). The Tariff Act of 1930 was amended by the so-called Reciprocal Trade Agreements Act of 1934 (48 Stat. 943; 19 U. S. C. §§ 1351–1354), which added section 350 thereto, and, among other things, authorized the President to enter into trade agreements with foreign governments and to proclaim the rates necessary to put such agreements into effect, limiting such changes in duties, however, to 50 per centum of the rates in effect when the law was passed. The President was also authorized to terminate any such proclamation at any time in whole or in part.

By trade agreement with Venezuela, the President agreed to reduce the tax, among other things, on imports of petroleum and petroleum products, including fuel oil derived from petroleum, which equaled 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year. This reduced rate was made effective on December 16, 1939, by Presidential proclamation (54 Stat. 2402; 75 Treas. Dec. 165, T. D. 50015). The tax on petroleum and products imported in excess of the foregoing tariff quota was left at the statutory rate of ½ cent per gallon.

Thereafter, the President, by trade agreement with Mexico, agreed to reduce the import tax on petroleum and certain specified petroleum products enumerated in section 3422 of the Internal Revenue Code, including fuel oil derived from petroleum, to ¼ cent per gallon. Proclamations executing this undertaking were published and ·became effective on January 30, 1943 (57 Stat. 833–909; 78 Treas. Dec. 190–206, T. D. 50797). No tariff quota or other limitation was made in connection with the rate of ¼ cent per gallon under the Mexican Trade Agreement, and it, therefore, applied to all imported merchandise of that description.

The act of July 5, 1945 (59 Stat. 410) provided, among other things, that the second sentence of section 350 (a) (2) of the Tariff Act of 1930, as amended by the Reciprocal Trade Agreements Act, *supra*, be amended to read as follows:

No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945 (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists.

The rate of tax or duty of ¼ cent per gallon fixed by proclamation pursuant to the Mexican Trade Agreement was still in effect on January 1, 1945, and was likewise unchanged by the Presidential proclamation which followed the General Agreement on Tariffs and Trade (61 Stat. 1103; 82 Treas. Dec. 305, T. D. 51802), which continued the reduction in the tax on topped crude petroleum and fuel oil derived from petroleum, but tied the rate applicable thereto to the rate of tax applicable to crude petroleum.

On September 6, 1950, the President issued Proclamation No. 2901, effective January 1, 1951 (64 Stat. A427; 85 Treas. Dec. 252, T. D. 52559), the purpose of which was stated to be, among other things, to make certain changes in existing rates of duty that were required or appropriate to carry out the provisions of the General Agreement on Tariffs and Trade and the Venezuelan Trade Agreement. We are concerned with the Presidential action only insofar as it increased the tax on the petroleum at bar.

In its recitals, the proclamation states that the rates of duty agreed to in the trade agreement with Mexico had been effectuated by earlier proclamations of December 28, 1942, and December 31, 1942, respectively, and that thereafter the parties in question had agreed that said trade agreement with Mexico should cease to be effective after December 31, 1950. It recites further that an earlier trade agreement had been entered into between the United States and Venezuela, effective December 14, 1940, that had fixed a duty of ¼ cent per gallon on a limited quantity of crude petroleum and certain petroleum products, including fuel oil derived from petroleum. The balance remained taxable at the statutory rate of ½ cent per gallon. The proclamation then refers to the treatment of, among other things, fuel oil derived from petroleum, which had been accorded by the General Agreement on Tariffs and Trade.

Having thus recited the various actions which had theretofore been taken with respect to petroleum and petroleum products, the determination of the President is set forth in the sixteenth recital as follows:

16. WHEREAS I determine that it is required or appropriate to carry out the said trade agreements specified in the first and twelfth recitals of this proclamation

on and after January 1, 1951, that crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, as provided in said item 3422 set forth in the thirteenth recital of this proclamation shall be subject to import tax at the rate of ½¢ per gallon;

We have set forth the above statement in detail because it is indicative of the basis upon which the President acted. The sixteenth recital describes the contemplated action of increasing to ½ cent per gallon the tax on all imported petroleum in excess of a tariff quota equaling 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year as "required or appropriate to carry out the said trade agreements specified in the first and twelfth recitals of this proclamation." The trade agreement specified in the first recital was the General Agreement on Tariffs and Trade, and the twelfth recital refers to the trade agreement with Venezuela.

Having thus completed the recitals necessary to his action, the President proclaimed as follows:

PART I

\* \* \* \* \* \* \*

(b) The said proclamations of December 28 and 31, 1942, relating to the said trade agreement with the United Mexican States, shall be terminated in whole as of the close of December 31, 1950.

\* \* \* \* \* \* \*

PART IV

To the end that the said trade agreements specified in the first and twelfth recitals of this proclamation may be carried out, crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year beginning with the calendar year 1951, in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, specified in the said item 3422 set forth in the thirteenth recital of this proclamation, shall be subject to import tax at the rate of ½ cent per gallon.

We are impressed by the fact, apparent from the above-quoted excerpts, that there were no implicit assumptions that the mere termination of the proclamation relating to the trade agreement with Mexico automatically restored the rates proclaimed for crude petroleum pursuant to the trade agreement with Venezuela. An affirmative executive act (the proclamation of the Mexican Trade Agreement) had suspended the rates proclaimed pursuant to the Venezuelan Trade Agreement, and an affirmative executive act was deemed "required or appropriate" to restore the application of such rates.

Plaintiffs contend that the President is prohibited by the provisions of section 350 (a) (2) of the Tariff Act of 1930, as amended by the act of July 5, 1945, from issuing any proclamation increasing by more than 50 per centum the rate of tax on fuel oil derived from petroleum which was in effect on January 1, 1945; that the Presidential proclamation which is relied on by the Government to support the collector's assessment herein, published in T. D. 52559, purports to terminate an earlier proclamation which fixed the tax on imported petroleum and petroleum products at ¼ cent per gallon and to restore the tariff status which obtained under the trade agreement with Venezuela, i. e., fixing the tax at ½ cent per gallon on all of such merchandise imported in excess of a certain tariff quota; and that such action, resulting in an increase of more than 50 per centum in the rate of tax or duty applicable to such merchandise existing on January 1, 1945, is in violation of the provision of section 350 (a) (2), *supra*, and is, therefore, void. On this premise, the plaintiffs assert that the lawful rate of tax on fuel oil derived from petroleum is ¼ cent per gallon.

It is apparently not disputed that the rate of tax or duty existing on fuel oil derived from petroleum on January 1, 1945, was ¼ cent per gallon. The Government defends the action of the collector and the Presidential proclamation on which the collector relied by contending that such proclamation was not in fact or in law designed to promulgate a new rate of duty which had been agreed upon in a trade agreement. Rather, the Government contends, the proclamation of the President, reported in T. D. 52559, was one which declared that a trade agreement between the United States and Mexico had ceased to be effective by mutual consent. In such circumstances, the Government contends, the President is authorized to terminate any proclamation, and the increases in duty which may result therefrom are not affected by the 50 per centum limitation contained in section 350 (a) (2), as amended.

The question we are called upon to determine is whether the provisions in the Presidential proclamation, reported in T. D. 52559, which purport to impose a tax of ½ cent per gallon on imported fuel oil derived from petroleum in excess of a tariff quota are invalid because they result in an increase in excess of 50 per centum of the existing rate, as contended by plaintiffs, or whether, as asserted by the defendant, such rate of tax was lawful and justified by the statutory right of the President to terminate, in whole or in part, at any time, his earlier proclamation, fixing the rate of ¼ cent per gallon.

It is not disputed by the defendant that the only authority supporting the assessment here made is the Presidential proclamation, published in T. D. 52559. The issue thus is narrowed to whether or not the proclamation *lawfully* increased the rate of tax applicable to petroleum products such as that at bar.

The statute, section 350 (a) (2), as amended, of the Tariff Act of 1930, quite plainly prohibits the President from increasing or decreasing by more than 50 per centum any rate of duty, however established, which existed on January 1, 1945. It is undisputed that the only lawful rate of duty for merchandise such as that at bar on January 1, 1945, was the rate provided by the trade agreement with Mexico, ¼ cent per gallon. The increase to ½ cent per gallon is 100 per centum of the rate in effect on January 1, 1945, and is, therefore, expressly prohibited by section 350 (a) (2), as amended, *supra*.

Defendant's counsel earnestly contends, however, that the proclamation under consideration, insofar as it affected the import tax on petroleum and petroleum products, did not actually increase the duty but rather terminated the proclamations relating to the Mexican Trade Agreement, and that the higher rate, provided for by the Venezuelan Trade Agreement, thereby became effective by operation of law. In this connection, it is argued that the purpose of part IV of the proclamation, reported in T. D. 52559, hereinbefore quoted, was merely to *declare* the legal rate of tax or duty which became effective by operation of law by reason of the termination in whole, in part I of the said proclamation, of the earlier proclamations relating to the Mexican Trade Agreement. This declaration, it is said, was unnecessary from the standpoint of being a legal prerequisite to the imposition of the increased duties, but was included as an administrative guide to those whose duty it is to carry out the laws affected by the trade agreements program. We find no support for this position in either the proclamation or the statute.

The proclamation itself does not say that the increased rate of duty results from operation of law or that it has become an accomplished fact by virtue of the termination of the Mexican Trade Agreement alone. On the contrary, following the pattern of executive proclamations, it states the action to be taken and the reason and statutory authority therefor. Its jurisdictional prerequisites are intended to be self-contained.

It does not merely terminate the earlier proclamations relating to the Mexican Trade Agreement and leave the matter of the existing rate suspended in mid-air. It recites that the increased rate of duty on petroleum and petroleum products has been determined to be "required or appropriate" to carry out the provisions of the trade agreement with Venezuela and the General Agreement on Tariffs and Trade. Having made this determination, it proclaims "To the end that the said trade agreements * * * may be carried out" that the rate of duty on petroleum and petroleum products be increased to ½ cent per gallon.

It is quite apparent that the authority relied upon for this proclamation was that provision of section 350 (a) (2) which authorizes the

President to proclaim such modifications of existing duties "as are required or appropriate to carry out any foreign-trade agreement that the President has entered into hereunder." In short, the proclamation was evidently drafted to come within the letter of section 350, *supra*. In our opinion, it did so in all respects save one; it increased the existing duty on petroleum and petroleum products to an extent not permitted by the statute.

With reference to the statute, section 350, as amended, of the Tariff Act of 1930, as authority for the Presidential action herein, defendant's counsel argues that the authority of the President contained in the last sentence of section 350 (a) (2), as amended, to terminate in whole or in part his proclamations of modifications of existing duties, etc., is not limited by the 50 per centum formula set forth in the same section.

The statute, however, is not so written, and there appears to be no reasonable basis for applying this construction. The statute denies to the President the right to make *any* proclamation increasing or decreasing any rate of duty existing on January 1, 1945, by more than 50 per centum. This prohibition appears in the same subdivision of the same subparagraph as the authority to terminate proclamations of modifications of existing duties, etc.

It seems beyond question that Congress must have known, when it passed the act of July 5, 1945, containing the prohibition against proclamations increasing or decreasing any rate of duty, however established, existing on January 1, 1945, that the instrument through which the President acted, both in putting into effect modifications of existing duties, etc., and in terminating the same, was the proclamation. Consequently, when the statute commands that "*No* proclamation shall be made" [italics supplied], etc., a proper consideration of the language used, as well as the ordinary rules of statutory construction, would require that the prohibition apply to *any* proclamation made in connection with the subject matter of the legislation.

Our attention has been invited to the legislative history of the act of July 5, 1945, extending the authority of the President under section 350, *supra*, and counsel for the defendant has quoted in the brief filed in its behalf excerpts from the debates had in both Houses of Congress during the progress therein of the bill which was ultimately enacted. Counsel for both sides have cited and quoted from House Report No. 594, 79th Congress, 1st Session, being the report of the Committee on Ways and Means of the House of Representatives upon the bill, H. R. 3240.

It is well settled that recourse to such extraneous aids to construction of statutes is permissible only when ambiguity has been found to exist in the language of the statute in question. *United States* v. *Kung Chen Fur Corporation*, 38 C. C. P. A. (Customs) 107, C. A. D.

447, and cases therein cited. As an aside, it may be mentioned that legislative history may be referred to even though no ambiguity be found to exist if it be for the purpose of exemplifying or corroborating the validity of a conclusion otherwise reached. There, of course, the use of legislative history is not for the purpose of interpreting or construing a statute but to support a conclusion reached without the consideration of extraneous matters. *Universal Transcontinental Corp.* v. *United States*, 40 C. C. P. A. (Customs) 54, C. A. D. 497.

As we have already indicated, in our view, it would appear that the language adopted by Congress in section 350 (a) (2), *supra*, is free from doubt, uncertainty, or ambiguity. However, we may say that a careful examination of all of the material cited and quoted fails to reveal anything contained therein which could reasonably be considered to evidence the congressional intent with respect to the precise issue before us. It does not appear that the effect of terminating proclamations was discussed or treated, nor does it even appear that any collateral matter was discussed or treated in such a way as to point out the congressional understanding of the statutory language which would be determinative of the situation here involved.

It is our view that when legislative history source materials are relied upon for the purpose of interpreting statutes, the material should (1) be authoritative from the standpoint of expressing the will of the Congress which passed the act in question, and (2) clearly evidence the legislative intent in such manner as to be dispositive of the point at issue. Some of the material cited and quoted lacks the requisite indicia of authority, and none of it offers any aid in the determination of the legislative will in connection with the statutory language.

While it is not at all necessary for us to explore the purpose of the statute involved, it is appropriate for us to state what we have found in this regard has confirmed our opinion. The purpose for which the Trade Agreements Act was originally passed is stated in the body of the law itself. Fundamentally, it was to enable the President to enter into foreign trade agreements and proclaim modifications of existing duties, etc., accordingly, whenever he found as a fact that existing duties were unduly burdening and restricting the foreign trade of the United States to our economic detriment.

The limitation in the original 1934 statute was very plain:

* * * No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists.

*The law depends for its validity upon the incorporation therein of some such limitation and regulation.* That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of our constitutional system

of government. *Field* v. *Clark*, 143 U. S. 649. There is no objection, however, to the enactment into law of an intelligible principle or standard of conduct, reposing in the President authority to fix rates of duty in conformity with a clearly expressed legislative principle or formula. *J. W. Hampton, Jr., & Company* v. *United States*, 276 U. S. 394.

Such a formula, establishing conditions to be found by the President precedent to the exercise of authority to vary existing rates of duty by 50 per centum, was written into the so-called flexible provisions of the Tariff Act of 1930 (19 U. S. C. § 1336), the successor to section 315 of the Tariff Act of 1922, which was tested and found to be constitutional in *J. W. Hampton, Jr., & Co.* v. *United States, supra,* and *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294.

The entire context of section 350 (a) (2), as originally enacted, reflects a legislative purpose to prescribe the circumstances which must exist before any proclamation can be made changing existing rates of duty, and then to require, that in any event, such changes shall not exceed 50 per centum of the rates in existence at the time of the adoption of the law.

Between the time of enactment of section 350, *supra*, in 1934, and its amendment in 1945, frequent use was made of the authority given to the President to enter into trade agreements and proclaim modifications accordingly. In one or two instances in that period of time, after such trade agreement reductions became operative, their effectiveness was terminated by subsequent Presidential proclamation. The termination of such proclamations did not involve the question here under consideration, because any such proclamations resulted in restoration of the statutory rates.

For example, in the case of *Alfred Baer* v. *United States*, 8 Cust. Ct. 104, C. D. 585, the facts showed that a Presidential proclamation, effective March 15, 1938, reported in T. D. 49458, pursuant to the trade agreement with Czechoslovakia, reduced the rate of duty on hops from the statutory rate of 24 cents per pound to 18 cents per pound. By subsequent proclamation, effective April 22, 1939, reported in T. D. 49824, the earlier proclamation was terminated, and the statutory rate restored. Obviously, however, the second proclamation did not operate to increase the "existing rate of duty." It merely restored the original rate of 24 cents per pound.

We may judicially notice that between 1934 and 1945 numerous trade agreements were executed with foreign countries and that by Presidential proclamations existing rates of duty were reduced in conformity therewith. The United States was, nevertheless, interested in further reducing tariff barriers as a means of fostering international trade. Accordingly, the 1945 amendment to the Trade

Agreements Act was designed to permit increases or decreases up to 50 per centum of the rates in existence on January 1, 1945.

It is noteworthy that both the original Trade Agreements Act of 1934 and the 1945 amendment followed the pattern of the so-called flexible provisions of the tariff act with respect to the President's power to change rates.

Neither the original Trade Agreements Act nor the 1945 amendment thereof authorized executive changes in duty without a legislative standard or scheme. Had they, or either of them, done so, violation would have been done to the principle of decision in *Field* v. *Clark* and *Hampton* v. *United States, supra.* Plainly, the limitations on the President's power to act expressed a policy essential to the validity of the law, and, as hereinbefore indicated, the limitation was placed on the instrument through which the President acted—the proclamation. Since all acts of the President under this section relating to changes in rate were performed by proclamation, the limitation affected them all, and the law, as thus written, confined the delegated power to permissible limits.

Collateral indication that Congress wished to delegate to the President only authority to execute its legislative purpose is found in subsection (d) (3) of the 1945 amendment, which forbids the issuance of any proclamation for the purpose of carrying out any foreign trade agreement the proclamation to which had been terminated by the President prior to July 5, 1945. Quite obviously the Congress was legislating to give the President authority under section 350, as amended, to increase or decrease by 50 per centum the rates of duty in effect on January 1, 1945, *but to do no more.*

In the brief filed on behalf of the defendant, it is said:

Thus it will be seen from the foregoing that Section 350 (a) conferred upon the President of the United States the power to enter into trade agreements with foreign countries and reduce or increase duties by not more than 50 percent of that which prevailed on January 1, 1945. He also had authority to modify an agreement, subject to the same limitations, in order to carry out an escape clause in it, or to terminate it in part under the last sentence of Section 350 (a), *without any such limitation being applicable,* if this would lead to the result best suited to providing remedy for the injury. [Italics added.]

There is no implicit or explicit authority in the statute to support the suggestion that the President has authority to terminate a proclamation in part without regard to the limitations imposed by section 350, and no reason has been given to support the assertion that the limitation should apply in one instance and not in the other. Every presumption is to the contrary. The law neither states nor implies that Congress intended to give the President authority to increase or decrease rates of duty without limitations.

The argument of defendant that this interpretation of the statute would "seriously impair the effectiveness of the authority of the President" is, we think, without merit. We do not restrict the authority of the President when we define it as Congress conferred it. We conceive the limit of that authority to be to proclaim increases or decreases in duty to the extent of 50 per centum of the rates in existence on January 1, 1945, whether this be done as a means of effectuating a rate under a new trade agreement or terminating one that has been established by earlier proclamation. Whether or not Congress could have constitutionally delegated greater power to the President in one instance than in the other need not be here determined because of our conclusion that both the word and the purpose of the act reveal that it did not intend to do so.

The construction that is here given to the authority of the President to terminate earlier proclamations is not restrictive. It is harmonious with the law in letter and concept. The original statute empowered the President to terminate any proclamation made under it. By so doing, he did not increase or decrease at all the rates in existence on June 12, 1934; he merely restored such rates. Under the amended law, he has the same authority, but it is tied to rates in effect on a different date, January 1, 1945. Quite obviously, when he terminates any proclamation made subsequent to the date in the 1945 amendment, he does no more than restore the rates in existence on January 1, 1945. His authority to terminate any other proclamation is unchallenged if by so doing he does not violate the limitation imposed upon him by Congress with respect to the extent to which he may change existing rates. He may not do more because the law does not permit it.

We cannot assume that Congress was uninformed on the subject matter of its legislation. We must presume, therefore, that when the 1945 amendment was passed, Congress knew that the duty on petroleum was $\frac{1}{4}$ cent per gallon by proclamation, pursuant to the Mexican Trade Agreement, and that a complete termination of that proclamation, if lawful, would increase by 100 per centum the rate in existence on January 1, 1945. Effect must be given to the specific statutory prohibition against such increase. We cannot hold that it does not apply here, when, by its terms, it must apply to all proclamations.

While the question presented here is one of novel impression, there is no lack of precedent of applicable fundamental principles by which the case must be determined. The nature of the power delegated to the President must be understood. We are not here considering an authority intrinsically executive which finds its source in the Constitution and, therefore, requires a liberal interpretation. The duty, for example, to "cause the laws to be faithfully executed" is constitutionally executive, flowing from a fundamental grant of authority to

the executive that necessarily dictates a liberal judicial construction. *Sterling* v. *Constantin*, 287 U. S. 378, 399.

Here, the power is inherently legislative. It is not delegated with any suggestion that the legislature has abdicated to the President its constitutional authority to fix rates of duty. "It is canalized within banks that keep it from overflowing" (Cardozo, J., dissenting in *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 440). The validity of this delegation depends upon the retention by the legislature of discretion as to what the law shall be and this is done by imposing upon the executive a certain course of procedure and certain rules of decision in the performance of its function. *Wichita Railroad & Light Company* v. *Public Utilities Commission*, 260 U. S. 48, 59; *Panama Refining Co.* v. *Ryan, supra,* p. 432. We must necessarily recognize this limitation in the construction of the statute under consideration because, without it, the law would be invalid.

To the argument that this construction of the statute and proclamations under it would result in a serious impairment of the President's power to suspend rate reductions in retaliation for discriminatory treatment, or for the reasons specified in the so-called "escape" clauses included in trade agreements, three answers are at once apparent: First, it has not been shown that such impairment results from our interpretation of the statute in this case, or, indeed, that anything related to the President's retaliatory power or the operation of the escape clauses is at all involved. Second, there can be no impairment of the President's power to suspend rate reductions unless by statute such right has been conferred upon him, and no right has been given to the President to increase by 100 per centum the rate for crude petroleum existing on January 1, 1945. If Congress chose to legislate that in no circumstance would the President be authorized to proclaim changes beyond 50 per centum in the rates of duty in existence on January 1, 1945, then we do not impair his power when we construe the law to be as written. Third, there is no grant of power under this law, nor could there be, investing the President with authority to change rates of duty outside the standards and limitations which Congress necessarily imposed upon him.

As was recently stated by the United States Circuit Court of Appeals, Fourth Circuit (Parker, C. J.), in the case of *United States* v. *Guy W. Capps*, decided April 15, 1953 (21 L. W. 2523, 2524):

We think that whatever the power of the executive with respect to making executive trade agreements regulating foreign commerce in the absence of action by Congress, it is clear that the executive may not through entering into such an agreement avoid complying with a regulation prescribed by Congress. Imports from a foreign country are foreign commerce subject to regulation, so far as this country is concerned, by Congress alone. The executive may not by-pass congressional limitations regulating such commerce by entering into an agreement with the foreign country that the regulation be exercised by that country through

its control over exports. Even though regulation prescribed by the executive agreement be more desirable than that prescribed by congressional action, it is the latter which must be accepted as the expression of national policy.

We are faced here with the uncontrovertible fact that the proclamation under consideration does that which the statute says it may not do—it increases by more than 50 per centum the rate of duty existing on January 1, 1945, on petroleum and petroleum products, including fuel oil derived from petroleum. Whether it does so by direction or indirection, by promulgation of a new rate or termination of an old one, is of no concern. A result is accomplished by executive action which is specifically prohibited by law.

The case is not different if we assume, *arguendo*, that this circumstance was not contemplated by Congress, and that, if it were, the law would have been differently written. However that may be, in the construction of this statute, we are not so much concerned with what Congress intended to write as we are with what it meant by what it wrote. There has been no showing that hardship or unusual difficulty would result from our construction of this statute, but even if there were, that circumstance would not encourage us to indulge in so-called judicial legislation. The danger of that error was discussed by our Supreme Court in *Crooks* v. *Harrelson*, 282 U. S. 55, at p. 60, as follows:

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. *Monson* v. *Chester*, 22 Pick. 385, 387. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts. See *In re Alma Spinning Company*, L. R. 16 Ch. Div. 681, 686; *King* v. *Commissioners*, 5 A. & E. 804, 816; *Abley* v. *Dale*, L. J. (1851) N. S. Pt. 2, Vol. 20, 233, 235. And see generally *Chung Fook* v. *White*, 264 U. S. 443, 445; *Commr. of Immigration* v. *Gottlieb*, 265 U. S. 310, 313.

As has been said, the authority delegated to the President by the Trade Agreements Act, as amended, is intrinsically legislative; that is to say, it is a power which the legislature itself might rightfully exercise although in its limited scope it is not the power to make law. See Cooley, Constitutional Limitations, 8th ed., Vol. 1, p. 228. The authority of the President under such delegation can be exercised only in accordance with the policy and under the principles laid down by the legislature. Op. cit., pp. 229–230; *Wichita Railroad & Light Company* v. *Public Utilities Commission, supra.* See also

*Panama Refining Co.* v. *Ryan, supra*, where, at p. 433, the majority said:

> \* \* \* When the President is invested with legislative authority as the delegate of Congress in carrying out a declared policy, he necessarily acts under the constitutional restriction applicable to such a delegation.

Moreover, not only is the authority of the President under such a delegation so limited, but the statute itself must be strictly interpreted because it is a law imposing a tax. This point, too, was discussed in *Crooks* v. *Harrelson, supra*, when the Court said (p. 61):

> Finally, the fact must not be overlooked that we are here concerned with a taxing act, with regard to which the general rule requiring adherence to the letter applies with peculiar strictness. In *United States* v. *Merriam*, 263 U. S. 179, 187–188, after saying that "in statutes levying taxes the literal meaning of the words employed is most important, for such statutes are not to be extended by implication beyond the clear import of the language used," we quoted with approval the words of Lord Cairns in *Partington* v. *Attorney-General*, L. R. 4 H. L. 100, 122, that "if the Crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be. In other words, if there be admissible in any statute, what is called an equitable construction, certainly such a construction is not admissible in a taxing statute, where you can simply adhere to the words of the statute."

We believe that section 350, *supra*, as amended, discloses a fundamental legislative purpose to authorize the President to proclaim changes in the rates of duty which existed on January 1, 1945, that are within 50 per centum of such rates whenever such proclamations are required or appropriate to carry out undertakings of the United States made by trade agreement. The present proclamation purports to increase the duty on petroleum and petroleum products, including fuel oil derived from petroleum, by 100 per centum of the rate in effect on said date as a step required or appropriate to carry out' the provisions of certain trade agreements. To that extent the proclamation is unauthorized by statute and to that extent is, therefore, void.

We cannot read all the provisions of section 350 together and in harmony with their legislative objective and find therein a purpose to permit the President, on some occasions, to proclaim increases or decreases in rates of duty beyond 50 per centum of the rate in effect on January 1, 1945. We cannot find in the concept of delegation of legislative powers to the President the authority in the President to change tariff rates unless standards for his conduct and limits for his authority be securely engrafted in the law.

Under the statute as written, the upper limit to which the rates of duty applicable to fuel oil such as that here in issue could have been lawfully increased was 50 per centum of the rate in effect on January 1, 1945, which would be an increase of ⅛ cent per gallon to a total rate of ⅜ cent per gallon. As the action of the President was not within

this limit, his action in increasing the duty by ¼ cent per gallon to a total rate of ½ cent per gallon was void, and, there being no valid change of rate, the correct rate of duty applicable to the oil in question under the Trade Agreements Act, as amended, is ¼ cent per gallon, the rate in effect on January 1, 1945.

Plaintiffs' protest is therefore sustained, and judgment will issue directing the collector to reliquidate the entry accordingly.