FULDAUER, APPELLANT, *v*. CITY OF CLEVELAND ET AL., APPELLEES.

(No. 30133—Decided February 7, 1972.)

*Mr. Henry DuLaurence,* for appellant.
*Mr. Clarence L. James,* director of law, and *Messrs. Squire, Sanders & Dempsey,* for appellee city of Cleveland.
*Mr. Thomas J. Friel,* for intervening appellee.

MANOS, J.  Sections 198-1 and 198-2 of the charter of the city of Cleveland, hereinafter referred to as the "charter amendments" or "amendments," were adopted by the people of Cleveland on May 7, 1968.  Section 198-1, dealing with the annual rate of pay for members of the fire department, was placed on the ballot by initiative petition while Section 198-2, dealing with the annual rate of pay for the

238

police department, was submitted to the electorate by city council's enactment of ordinance No. 547-68.

In substance the two amendments are identical. They provide that the council of the city of Cleveland shall once a year between January 1 and February 15 survey the base rates then paid first grade firemen and policemen in other Ohio cities of 50,000 population or more, and shall no later than June 1 provide compensation by ordinance for police and firemen of first grade at a rate three percent (3%) higher than the highest rate paid of first grade in any city of Ohio with a population of 50,000 or more. In addition such pay ordinance shall include a sixteen percent (16%) differential between the ranks in the police and fire departments.

This case is on appeal from the Court of Common Pleas' denial of plaintiff's request for a declaratory judgment and injunctive relief in which the validity of the charter amendments was sustained.

The thrust of this appeal centers on the issue of whether or not the charter amendments calling for the police and fire departments of the city of Cleveland to be paid three percent (3%) higher than any other municipality in the state of Ohio of 50,000 population or more is an unconstitutional delegation of legislative authority. *The wisdom of the amendments is not involved in determining the legal issues.*

We find nothing in the Ohio Constitution which establishes the unconstitutionality of the charter amendments. The charter of a city is the "organic law" by which the people of a municipality are to be governed. So long as the organic law of the city is amended limiting the exercise of the legislative power of the local city council and the initiative power of the city's electorate, it is constitutional.

It is noteworthy that in a similar case the issue of delegation of legislative authority was resolved by the state of California in *Kugler* v. *Yocum* (1968), 69 Cal. 2d 371, 445 P. 2d 303. The court was asked to rule on an initiative ordinance in which the city of Alhambra, California was to establish a pay scale for its fire department. The salaries

would equal a sum not less than the average salaries paid to firemen in the city of Los Angeles. The court held that there was no delegation of legislative authority.

"In the instant case, the adoption of the proposed ordinance * * * will constitute the legislative body's resolution of the 'fundamental issue.' Once the legislative body has determined the issue of policy * * * the subsequent filling in of the facts in application and execution of the policy does not constitute delegation. Thus the decision on the legislative policy has not been delegated; the implementation of the policy by reference to Los Angeles salaries is not the delegation of it." 69 Cal. 2d at 377, 445 P. 2d 303 at 306-07.

The dissenting opinion doubted the constitutionality of the provision because it was to be accomplished by an initiative ordinance. However, the dissent went on to state that if the people adopted such a plan by charter amendment then "there would be no question of unlawful delegation of legislative authority."

While it is unconstitutional for the city to delegate its power to make a law, it can make a law to delegate a power to determine some fact upon which that law shall depend. The citizens of Cleveland, through their charter, have chosen the way in which their police and firemen will be paid. The fact is, having determined the fundamental issue, they delegated nothing. No other community in Ohio of a population of 50,000 or more is asked to legislate for Cleveland. The Cleveland city council in implementing the charter amendments has been given standards to use in determining the wages of police and firemen. They look to other Ohio cities of 50,000 population or more to obtain statistical data only. The primary concern over standards is to protect the public by safeguards against arbitrary actions. See *Kugler* v. *Yocum, supra.* Here, the formula contained in the amendments is exact because it provides that no later than the 15th day of February in each year, the Cleveland city council shall survey and certify the rates paid to employees of all Ohio cities of 50,000 population or over, and shall by the 1st of June of each year compensate Cleveland's police and firemen at a rate three percent (3%) higher than any other surveyed Ohio city. The

amendments, therefore, contain the essential safeguards vital to the protection against arbitrary actions by those assigned the duty to compute the wages.

There is nothing unique about the problem presented in this case. Analogous law exists in Ohio's "prevailing wage law" (R. C. 4115.03-4115.09) and in Ohio's minimum fair wage standards (R. C. 4111.01-4111.09) which was held "not [to] offend or transgress the federal or state constitutions" in *Strain* v. *Southern* (1947), 148 Ohio St. 153. Here data is similarly obtained and used to establish wages. Even a more striking analogy is found in Section 191 of the charter of the city of Cleveland which requires council to compensate classified employees in accordance with the prevailing rate of like services. A tradesman employed by the city will receive compensation equal to the rate paid in private industry under union contracts. Since the city is not a party to union collective bargaining, it can hardly be contended that the city has unlawfully delegated the power to establish wages by factors beyond its control. See *Adams* v. *Wolff* (1948), 84 Cal. App. 2d 435, 190 P. 2d 665. There is no meaningful distinction between a situation where a union pay scale is increased and the situation where an Ohio city of 50,000 population or more increases the wages of their policemen and firemen.

*Judgment affirmed.*

SILBERT, J., concurs.

DAY, J., dissenting. With deference, I dissent. My reasons are elaborated below:

I.

This case comes here on appeal from a decision of the Court of Common Pleas of Cuyahoga County, Ohio, denying plaintiff appellant's request for a declaratory judgment and injunctive relief[1] and sustaining the validity of Sec-

---

[1]The case was reargued on October 1, 1971. Subsequent to the initial argument another member of the class, Norma Rudnickas, was substituted on motion [Rule 29 (B), Rules of App. Proc.] when the appellant Fuldauer indicated a desire to withdraw.

tions 198-1 and 198-2 of the Cleveland city charter. The first, Section 198-1, was submitted to referendum by city council, as required by Section 9, Article XVIII, Ohio Constitution, upon receipt of an initiative petition signed by the required percentage of the electorate of the municipality. The second, Section 198-2, was submitted to the electorate by council without the initiative. This submission also was authorized by Section 9, Article XVIII, Ohio Constitution. Both submissions were adopted by the voters of the city of Cleveland and became charter amendments under the indicated section numbers.

These charter amendments are substantially alike. One, Section 198-1, establishes the annual rate of pay for members of the fire department, and the other, Section 198-2, establishes the annual rate of pay for members of the police department. In their essential terms Sections 198-1 and 198-2 provide for a city council survey of base rates for first grade firemen and patrolmen, respectively, once each year between January 1 and February 15. The survey is carried out in Ohio cities, other than Cleveland, with populations of 50,000 or more. Thereafter, the amendments require that once each year, not later than June 1, city council shall provide by ordinance that firemen and patrolmen of the first grade in the employ of the city of Cleveland shall receive a base rate three percent higher than that paid by such other Ohio cities to their firemen and policemen of the first grade at the time of the counciliar survey. In addition the ordinances establishing the base rates as described shall provide for base rate differentials of sixteen percent between each of the ranks within the fire and police departments.

Hereafter the Sections 198-1 and 198-2 shall be referred to as the "charter amendments" or the "amendments" and will be treated together because each issue raised as to one is applicable to the other. For the sake of simplicity, the parties, including the substituted appellant (see fn. 1), and defendants appellees, the city of Cleveland, certain of its officials and intervening members of the division of fire, city of Cleveland, will be designated "plain-

tiff" and "defendants," or "defendant city," and "defendant city officials" or "defendant intervenors," respectively.

## II.

Plaintiff sees the underlying issues in this case as raising a multiplicity of federal and state constitutional questions. These range from the destruction of self-rule and of the republican form of government, to an "illegal and unconstitutional" deprivation of minority constitutional rights by the majority.[1a]

The defendants, on the other hand, reduce the issue to the single question:

"Did the people of the city of Cleveland violate any provision of the United States or state Constitutions by amendment of their charter and enacting Sections 198-1 and 198-2 relating to the computation of wages to be paid to policemen and firemen?"

I take a view of the issue or issues which makes it unnecessary to reach federal constitutional questions and permits even further condensation. In my view the singular question is:

"Was the enactment of Sections 198-1 and 198-2 of the Cleveland city charter by the electorate of Cleveland a delegation of legislative power prohibited by the Constitution of the state of Ohio."[2]

I would answer the question affirmatively and reverse.

---

[1a]Also included among the constitutional issues raised by the plaintiff were the destruction of freedom of contract guaranteed by the Federal and Ohio Constitutions; the levy of taxes without the approval of a majority of the municipal electors contrary to Article XII, section 2 of the Ohio Constitution; the discriminatory establishment of a privileged class not repealable by the city legislative body in violation of Article I of the Ohio Constitution and especially section 2 of that Article; an overreach of the governmental power to control wages permitted by Article II, section 34 of the Constitution of Ohio; and illegal delegations of legislative power and violation of local government alternatives under Article XVIII of the Ohio Constitution.

[2]For the purposes of resolving the issue involved in this opinion, there is no difference of consequence between a delegation by councilmanic ordinance and delegation by charter amendment approved by the electorate except that the latter removes control more completely.

## III.

There are devolutions of legislative powers which are *not* in issue in this case. An example of such devolvement is the constitutional distribution here between principal and subordinate entities within the same sovereignty. Cf. the discussion in *Hilton* v. *Board of Education* (1935), 51 Ohio App. 336, 345-346. In this instance the principal unit of government is the state of Ohio and the subordinate the city of Cleveland. Under the provenance of the Constitution of the state of Ohio, the city of Cleveland has acquired a charter and with it the power of local self-government[3]— a condition that posits a quantity of legislative power. There is no question here as to the propriety of this devolvement. Rather, the issue here involves the still further sloughing off of authority by way of charter amendments compelling wage changes contingent upon the actions

---

[3]Ohio Constitution, Article XVIII:

Section 3: [Powers.]

Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws. (Adopted September 3, 1912.)

Section 7: [Home rule.]

Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government. (Adopted September 3, 1912.)

"Although Section 3 of Article XVIII of the Constitution limits the authority of municipalities to adopt and enforce 'police, sanitary and other similar regulations' to such 'as are not in conflict with general laws' there is no such limitation with respect to the 'authority to exercise all powers of local self-government,' which is provided for in Sections 3 and 7 of that Article." *The State, ex rel. Bindas,* v. *Andris* (1956), 165 Ohio St. 441, 444. "Of course, the mere fact that the exercise of a power of local self-government may happen to relate to the police department does not make it a police regulation within the meaning of the words 'police * * * regulations' found in that [Article XVIII, Section 3] constitutional provision." *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 197. The police power—local self-government dichotomy is of small significance here. The decision does not turn on it. The question is whether home rule powers are themselves subject to the Constitution of Ohio. Cf. *State, ex rel. Pecyk,* v. *Green* (1953), 102 Ohio App. 297, 301.

of other subordinate units of governmental power in Ohio, coordinate in status but outside the authority of the Cleveland charter or any Cleveland governing body, *i. e.*, the power to change Cleveland service force wages lies with Ohio municipalities with populations equal to or in excess of 50,000. Such municipalities may or may not have the same problems or financial resources in relation to size as Cleveland. Nevertheless, if any such municipality moves upward to equal or exceed Cleveland rates, Cleveland, under the amendments, must follow and go on to a point 3 percent higher in the first grade with corresponding adjustments between grades.

It is this delegation of power to cities other than Cleveland upon which the constitutional question in this case pivots. A classic Ohio statement of the distinction between legal and illegal delegations of power appears in *Cincinnati W. & Z. R. R. Co.* v. *Clinton County Comm'rs.* (1852), 1 Ohio St. 77, 88-89:

"The true distinction * * * is between the delegation of power *to make the law*, which necessarily involves a discretion as to *what it shall be*, and conferring an authority or discretion as to its *execution*, to be exercised under and *in pursuance of the law*. The first cannot be done; to the latter no valid objection can be made." (Emphasis added.)[4]

---

[4]The reasons assigned for the non-delegation principle are the separation of powers, due process of law and the doctrine of *delegata potestas non potest delegari* (a delegated power cannot be delegated). See discussion of the last-named doctrine and the separation of powers in *J. W. Hampton, Jr. & Co.* v. *United States* (1928), 276 U. S. 394, 405-406, 72 L. Ed. 624, 629. The federal experience illuminates the delegation problem. Two exceptions to invalid delegation were established early in the interpretative history of the federal constitution. The delegation meets constitutional standards when the congress defines the policy and (1) leaves to the executive the development of the necessary supplementary regulations to effectively carry it out or (2) makes it operative upon a contingency which is satisfied when an executive finding of fact is made. The first method illustrates "fill[ing] up the details" of a statute recognized early in *Wayman* v. *Southard* ('1825), 10 Wheat. 1. The second method, the satisfying of a fact finding contingency to make a declared policy operative, was approved earlier still. *The Brig Aurora* (1813), 7 Cr. 382. For some hint at the

Classical or not the statement of the valid delegation principle in the *Clinton* case does not throw much light on the constitutional status of a particular delegation of authority unless, and until, there is a supply of detail either in the delegation from the legislature itself, or from the executive, or through judicial explication. While the general rule is that no delegation of legislative power to *make* the law is valid, it is clear that every regulatory statute involves some exercise of guided power to implement by the agency with responsibility for effectuating the policy of the law. The distinction between power to legislate and power to implement is only the beginning. The difficult issues arise when the method[5] the legislative authority adopts to implement its policy raises the question whether the power to legislate rather than the power to implement has been delegated.

It had been said that the reasons for delegating power "can be compassed by" the single generalization:

"Power should be delegated where there is agreement that a task must be performed and it cannot be effectively performed by the legislature without the assistance of a delegate or without an expenditure of time so great as to lead to the neglect of equally important business. Delegation is most commonly indicated where the relations to be regulated are highly technical or where their regulation requires a course of continuous decision."[6]

difficulties generated in applying the legislatively created generalities, see the text of this opinion following the statement of principle in the *Clinton* case. Cf. *State, ex rel. Selected Properties, Inc.*, v. *Gottfried et al.* (1955), 163 Ohio St. 469, 470-471.

[5]Legislatures have demonstrated from time to time in statutes that detailed regulation can be part of the legislative function. Some other statutes are examples of generality requiring the courts to supply standards and any statute may force interpretation on some score. Other types demanding or allowing administrative rule making are well known. Of course, there is no necessary "war" between legislation and administration. Delegation can involve "a permanent creative partnership between legislation and administration." See Jaffe, "An Essay on Delegation of Legislative Power: I," 47 Columbia L. Rev. 359, 360-366 (1947).

[6]*Jaffe, id.* at 361.

The delegation in issue in the present case might survive such tests of the necessity to delegate. For example, the problem of an analysis of all wage actions in Ohio municipalities of more than 50,000 population other than Cleveland might very well make unsupportable demands on counciliar time. However, these test points need not be reached in order to decide this case. For *another crucial element* to valid delegation is *legislative control* of the delegated power. And that is the crucial question here. Can power to *make the law*[7] be said to have been retained within the constitutional local self-government allowed Cleveland when an irresistible condition (whose coming into existence depends wholly upon the future acts of non-Cleveland legislative bodies) will require a pay raise? Can that result be constitutionally achieved even by charter? Stated another way, may a power to implement, legitimate under the Ohio Constitution if passed to controlled *administrative* delegates of the city of Cleveland in accordance with specified standards or conditions, be equally legitimate if conferred on another, or several other, *uncontrollable legislative councils* whose acts will ineluctably require a Cleveland raise?[8] This is the issue underlying the constitutional question which animates this case.

---

[7]In this case the power was exercised by the electorate to amend the charter. Obviously, the charter *may* limit the council more stringently than it limits the electorate. For example, if the quantum of local self-government powers represented by the charter does not exhaust the amount of power that the Constitution permits, the electorate could amend the charter to occupy those constitutionally available areas not encompassed by the charter before amendment. The council, on the other hand, cannot go beyond the charter *as it is*, regardless of what enlargements are constitutionally possible. These considerations do not control the issue here, however. This is so because the question in the present case is whether the charter amendments exceed constitutional bounds. (The issue is not the separation of power between the executive and legislative branches. Rather it is the total divestment of legislative power and transfer to other legislative bodies.)

[8]Devices for controlling delegated legislative power include legislative settlement of policy questions, legislative scrutiny of delegate's action "with a view to revision" and rule making. Cf. Jaffe, An Essay on Delegation of Legislative Power: II, 47 Columbia L. Rev. 561, 593 (1947). These devices do not exhaust the possibilities. However,

It has been pointed out that the need in legislative delegations is not so much for standards as *safeguards against arbitrariness.* When power leaves legislative hands, standards are but one way of implementing control. See Davis, 1 Administrative Law Treatise, Section 2.15 (1958). There are no such safeguards in the instant case.

It is an evident proposition that the Cleveland charter, with its amendments, is a creature of the Ohio Consitution and must conform to it.[9] In determining conformance, a court is duty bound to reconcile the charter and the Constitution if it can. In my view this duty to reconcile is exactly analogous to the duty to reconcile a statute and the higher authority of the Constitution, *Belden* v. *U. C. L. Ins. Co.* (1944), 143 Ohio St. 329, 340.[10]

Reconciliation in this instance is attempted, of course, on the assumption that the amendments bear the same presumption of validity afforded statutes or ordinances, see *Cincinnati W. & Z. R. R. Co.* v. *Clinton County*

---

this short listing illustrates particulars in which the Cleveland legislative authority could *not* exercise control of wage increases accomplished under the delegation effected by the charter amendments in issue here even were the Cleveland council to attempt to do so.

[9]*State, ex rel. Hinchliffe,* v. *Gibbons* (1927), 116 Ohio St. 390, 395. That case involved a constitutional requirement that obligated the city council to submit to the electorate a charter amendment proposed by initiative petition. The Supreme Court of Ohio held that since the Constitution required the city legislative authority to make the submission, the legislative authority also had to determine the sufficiency of the initiative petitions and whether all statutory requirements had been met. The people could not shift such determinations to the county board of elections *even by charter amendment* without violating the Constitution.

[10]Cf. *Cleveland* v. *Piskura* (1945), 145 Ohio St. 144, 156, where a Cleveland ordinance was held unauthorized. *Part* of the rationale of decision was that Congress had pre-empted the field. That is, the United States Congress had determined, according to the Supreme Court of Ohio, that federal courts should have exclusive jurisdiction in criminal cases under the federal emergency price control act of 1942. The municipal and federal authority could not be reconciled. Therefore, the municipal authority had to yield.

*Comm'rs., supra,* 82; *Reutener* v. *Cleveland* (1923), 107 Ohio St. 117, 142. It is attempted also, with full awareness that the effort to reconcile requires the squaring of the surrender of wage fixing under the instant charter amendments to agencies outside Cleveland with the requirement that Cleveland exercise its own local self-government under the Ohio Constitution. Cf. *State, ex rel. Hinchliffe,* v. *Gibbons, ibid.,* 395 and *Cleveland* v. *Piskura* (1945), 145 Ohio St. 144, 157.

A threshold consideration in the reconciliation process is cradled by the fact that the surrender is by *charter amendment* and the charter is the ''Constitution of Cleveland'' for local government purposes with all the inflexibility that constitutional status implies for the effect on council's power. That is, council cannot act contrary to the amendments. In the present instance it is, in effect paralyzed by the amendments to its organic document, the fundamental law, the municipal constitution, see *Adams et al.* v. *Wolff* (1948), 84 Cal. App. 2d 435, 190 P. 2d 665, 670; cf. *State, ex rel. Pecyk,* v. *Greene* (1953), 102 Ohio App. 297, 301, 303-304, which in charter cities is the source of counciliar authority. This anomaly is deepened by another consideration. While the Cleveland council is rendered catatonic by its own charter amendments—on the subject of police and firemen's pay—those same amendments extend uncontrolled power over the same subject to any council of any city in Ohio of more than 50,000 population (which acts on the subject for whatever reasons appeal to it) and for an indefinite time in the future. ''An uncontrolled discretion,'' the Ohio Supreme Court has said, ''has invariably been held to be a delegation of legislative power,'' *Northern Boiler Co.* v. *David* (1952), 157 Ohio St. 564, 570, and is unconstitutional.

This analysis reveals the unbridled nature of the delegation of power. A key distinction between ordinance and charter wage determinations highlights constitutional considerations because of the difference in counciliar control. To illustrate, under the Cleveland charter even an initiated ordinance can be repealed *by an ordinance* simply passed

by council, Chapter 7, Section 58, Cleveland City Charter, *but a charter* provision cannot.[11] Amendment of the latter involves a longer, more indirect, more expensive, and less predictable control.[12]

The Ohio cases, so far as my research reveals, have not dealt with delegations of power in the exact context in which it arises in the instant case. In this state the traditional ''standards'' language is often used to describe the principle that legislative policy setting, coupled with contingency fact finding or the filling in of details by a dele-

---

[11]The authorities are not uniform. Some courts have struck down even *ordinance* sourced wage settings when developed by reference to determinations by a federal official, *Crowley* v. *Thornbrough* (1956), 226 Ark. 768, 294 S. W. 2d 62, or to an outside source such as area trade scales or collective bargaining contracts, *Bradley* v. *Casey* (1953), 415 Ill. 576, 583-585, 114 N. E. 2d 681, 685 (Statute); *Wagner* v. *Milwaukee* (1922), 177 Wis. 410, 416-417, 418-419, 188 N. W. 487, 489, 490 (Ordinance by Council) or when the settings were made by a state labor commissioner or city manager, *Adams et al.* v. *Albuquerque* (1957), 62 N. M. 208, 209-211, 307 P. 2d 792, 793-794, and especially where the wage setting depends upon a future determination of facts as contrasted with a simple reference to a fact already in existence, *e. g.*, an existing prevailing wage. Unconstitutionality in the last circumstance is sometimes stated in terms of inadequate standards because of the unpredictability of the future, although the unpredictability stricture can be interpreted also in terms of lack of safeguards to insure control. See *Schryver* v. *Schrimer* (1969), 84 S. D. 352, 357-358, 171 N. W. 2d 634, 637. On the other hand *Kugler* v. *Yocum* (1968), 69 Cal. 2d 371, 445 P. 2d 303, finds a technique quite similar to that utilized in the Cleveland charter amendments not to be an invalid delegation of legislative power. In that case the ordinance was initiated and could not be repealed without a vote by the electorate. See fn. 2, *Kugler* v. *Yocum, id.* at 375, 445 P. 2d at 305.

[12]Admittedly the distinction breaks down in a jurisdiction in which an initiated ordinance cannot be repealed by simple action of council but requires an initiated repealer. Cf. fn. 2. *Kugler* v. *Yocum, ibid.*, at 375, 445 P. 2d at 305. In the present case this is no issue since charter amendments are involved. Apparently there is nothing wrong with wage setting by initiated ordinance or council passed ordinance unless an unconstitutional delegation is involved. See, *p. e.*, the cases cited in the text at the point relevant to fn. 11. Some cases have used the test "purely legislative" versus "quasi-legislative" as the litmus, upholding only quasi-legislative delegations. See *Schryver* v. *Schirmer, id.* at 354-355, 171 N. W. 2d at 635.

gate to implement the legislative policy, accomplishes constitutional delegation. Cf. *Cincinnati W. & Z. R. R. Co.* v. *Clinton County Commrs., supra,* 88-89; *Matz* v. *Curtis Cartage Co.* (1937), 132 Ohio St. 271, 280-284. However, up to now, the case closest on its facts to the present one is *Cleveland* v. *Piskura, supra,* 156, 158. In the latter case an attempt to condition policy effectiveness upon the action of a federal agency, the office of price administration, was struck down by the Supreme Court of Ohio, in part, because delegation went to an entity outside Ohio legislative control.[13] Thus, the operative facts in both the *Piskura* case and the present case are generically identical, i. e., both involve delegation to an entity *beyond the reach* of the legislative body. But the loss of control is greater in the present case than in *Piskura* because of the inability of the Cleveland council to retrieve its power by simple legislative act. Having lost the power by charter amendment it can only be replaced the same way.

In my view, therefore this case presents an even stronger case than *Piskura* for the proposition that the delegation is unconstitutionally placed.

Despite the flat statement in the appellee's brief that the principle involved in the present case "is precisely the same as that employed in Ohio's 'Prevailing Wage Law' [and] such law was approved in *Strain* v. *Southerton* (1948), 148 Ohio St. 153,"[14] the *Strain* case neither addresses, decides, nor approves the principle involved here. Neither the syllabus nor the text anywhere treats the problem of the transfer of legislative power to another agency beyond the control of the legislating authority. Instead, the case takes an orthodox position on the subject of delegation.

The *Strain* case upheld the constitutionality of state minimum wage legislation[15] and found no unconstitutional

---

[13]Accord: *Crowley* v. *Thornbrough, supra,* note 11 at 773-774, 294 S. W. 2d at 66.

[14]Appellee's brief, page 5.

[15]The constitutionality of minimum wage enactments by the Congress had been upheld seven years earlier, see *United States* v. *F. W. Darby Lumber Co.* (1941), 312 U. S. 100, 85 L. Ed. 609.

delegation of legislative power where the statute simply set general guidelines and did not require unwaivering allegiance to any particular wage set by an agency not within the control of the statutory delegate. The statutory sections in question were 154-45 d, e, f, g, h, i, j, m, n, and p of the Ohio General Code. These sections were the predecessors of R. C. 4111.01, .03, .04, .05, .06, .07, .08, .09, and .13, *not* R. C. 4115.03-4115.99 (see footnote 14). Thus, when defendant city refers to the latter statutes and asserts that the *Strain* case "approved such law" it asserts as fact what is not fact. Moreover, the permissive flexibility of the guidelines in G. C. 154-45 (as contrasted with the iron mandate in the charter sections in issue here) is demonstrated by the directions given the state's own agents in G. C. 154-45d (8):

"* * * In establishing a minimum fair wage for any service or class of service under this article, the *director, superintendent* or *the wage board* without being bound by any technical rules of evidence or procedure (1) *may* take into account all relevant circumstances affecting the value of the service or class of service rendered, and (2) *may* be guided by like considerations as would guide a court in a suit for the reasonable value of services rendered where services are rendered at the request of an employer without contract as to the amount of the wage to be paid, and (3) *may* consider the wages paid in the state for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards * * * ." *Strain* v. *Southerton, id.* at 156-157. (Emphasis supplied.)

Thus, from the statutory directions it is clear that the state's agents, *whom it controls,* are advised how to proceed in implementing policy but no *outside* entity (as, for example, any state in the United States bearing a specified population) can act in a way to *compel* Ohio to conform to wage standards it does not legislate. This is the heart of the matter.

I arrive at these conclusions without assessing the wisdom of the charter device involved here. That device, by reciprocal ratchetting of wage increases between Cleveland employees and those of any other Ohio city with 50,000 or

more population and a comparable wage scheme, would fuel automatic wage increases ad infinitum.

I would reverse as contrary to law and remand to the trial court for further proceedings consistent with this opinion.