## J. W. HAMPTON, JR., & COMPANY v. UNITED STATES.

### CERTIORARI TO THE UNITED STATES COURT OF CUSTOMS APPEALS.

No. 242.   Argued March 1, 1928.—Decided April 9, 1928.

1. Section 315 (a), Title III, of the Tariff Act of Sept. 21, 1922, empowers and directs the President to increase or decrease duties imposed by the Act, so as to equalize the differences which, upon investigation, he finds and ascertains between the costs of producing at home and in competing foreign countries the kinds of articles to which such duties apply.   The Act lays down certain criteria to be taken into consideration in ascertaining the differences, fixes certain limits of change, and makes an investigation by the Tariff Commission, in aid of the President, a necessary preliminary to any proclamation changing the duties.

*Held* that the delegation of power is not unconstitutional. P. 405.

2. Congress has power to frame the customs duties with a view to protecting and encouraging home industries. P. 411.

14 Ct. Cust. App. 350, affirmed.

CERTIORARI, 274 U. S. 735, to a judgment of the Court of Customs Appeals, which affirmed a judgment of the United States Customs Court, 49 Treas. Dec. 593, sustaining a rate of duty as increased by proclamation of the President.

*Mr. Walter E. Hampton* for petitioner.

The difference in cost of production at home and abroad cannot be found as a fact without using discretion and judgment, choice between different results, at every stage, thus expressing the exercise of the legislative will.

The fact that the cost of joint products and by-products cannot be separated except arbitrarily, that alone, and by itself, makes § 315 unconstitutional.

There is no magic about the word " finding." The act of making the " finding " itself has no creative power.

The complete breakdown of any argument from necessity as sanction for § 315, because Congress has itself been fixing tariff rates without difficulty, since the beginning, completely distinguishes the cases cited by the Government where the question of delegating legislative power was actually raised and discussed by this Court. *Buttfield* v. *Stranahan,* 192 U. S. 470; *Waite* v. *Macy,* 246 U. S. 606, T. D. 37647; *United States* v. *Grimaud,* 220 U. S. 506; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177; *Hannibal Bridge Co.* v. *United States,* 221 U. S. 194; *United States* v. *Chemical Foundation,* 272 U. S. 1; *Field* v. *Clark,* 143 U. S. 649; *In re Brig Aurora,* 7 Cranch 382.

The expression in sub-section C, " the President in so far as he finds it practicable shall take into consideration . . . any other advantages or disadvantages in com-

petition," in itself, renders § 315 unconstitutional. On account of its presence alone, we submit, this Court should declare the section unconstitutional without even considering the question of the unconstitutionality of the " difference in cost of production " formula.

The court below makes the fatal admission that the difference in cost of production at home and abroad cannot be precisely established, and further that a discretion is bestowed on the President as to how he shall find such cost differences.

The *Countervailing Duty* cases, *Downs* v. *United States*, 187 U. S. 496, and *Nicholas* v. *United States*, 249 U. S. 34, do not support the legality of § 315.

In countervailing duty, Congress itself provides that whenever any country gives a bounty, rebate or grant upon the exportation of merchandise dutiable under our tariff, an additional duty " equal to the net amount of such bounty or grant " shall be levied on such merchandise upon importation here.

The appraisement cases have no place in this discussion. The distinction between executing or applying an existing ad valorem to a particular importation on the day of exportation, and making a new rate of taxation to apply in the future by changing an existing tariff rate, should be self-evident. The fact that some kind of cost calculations occasionally crept into finding ad valorem market value, would not make the two processes similar in any respect. One still applies an existing rate and the other fixes a new tax rate for the future.

A non justiciable subject-matter, such as this, cannot be made into a judicial process, nor can the ultimate duty be laid upon the courts, by review of this machinery, to take part in fixing the tax rate. Consequently the Interstate Commerce Commission cases which deal with a justiciable subject-matter are not in point and are not authority for the legality of a flexible tariff.

The currency cases do not support the Government's position. *Cramer* v. *Arthur,* 102 U. S. 612; *Arthur* v. *Richards,* 90 U. S. 259; *Hadden* v. *Merritt,* 115 U. S. 25; *United States* v. *Klingenberg,* 153 U. S. 93. Congress has a right to place any value for customs purposes it pleases on foreign money. It authorized the Secretary of the Treasury to proclaim such value for a year and from quarter to quarter, thus coming nearer the true value, and being a fairer way of doing it. It was plain that Congress could not pass such a currency valuation statute every quarter. Many months Congress is not even in session. To thus relax the arbitrary rule and make it less arbitrary was not delegating legislative power or taxing power.

The *Chemical Foundation* case, 272 U. S. 1, is not in point.

A levy frankly stated to be for the purpose of protection, irrespective of revenue, is illegal. *Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20; *Hill* v. *Wallace,* 259 U. S. 44; *Loan Association* v. *Topeka,* 20 Wall. 655.

Had there been no tax clause in the Constitution, could § 315 have been enacted under the power to regulate commerce? But even if Congress can tax under the commerce clause alone, it cannot make a levy for a private purpose. A tax to equalize foreign and domestic cost differences is not in any rational sense of the word a regulation of commerce. Commerce cannot be regulated for a frankly declared private purpose.

The President cannot be delegated the authority to levy taxes for the regulation of commerce any more than he can be delegated authority to levy taxes for the raising of revenue.

On the other hand, assuming, for the purpose of the argument only, that the section is a legal delegation, the commerce clause gives it no support or sanction as being on its face for the private purpose of "protection" to

certain purely domestic industries. Otherwise the commerce clause could be invoked as authority for a direct subsidy out of the public treasury paid to domestic manufacturers to make up "cost differences." Such a duty levied to meet "cost differences" no more affects commerce than such a direct subsidy paid to make up such differences.

We are dealing here with a limitation on the powers of Congress not to delegate to the executive the power of legislation or the power of taxation. This limitation is not to be destroyed by an implication expanding the powers which it expressly limits. *Fairbank* v. *United States,* 181 U. S. 283; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312; *I. C. C.* v. *Brimson,* 154 U. S. 447.

Even if Congress can tax under the commerce clause, such tax must still be laid by Congress itself, without delegation to executive authority, and such tax must still be levied for the " general welfare," and not for a private purpose plainly expressed upon the face of the statute.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Lawrence* and *Messrs. Marion De Vries,* Special Assistant to the Attorney General, and *Robert P. Reeder,* Attorney in the Department of Justice, were on the brief, for the United States.

The statute does not attempt an unlawful delegation of legislative authority. It delegates to the President the power to find facts, not the power to make law. He is to determine, with the assistance of the Commission, the domestic and foreign costs of production and the difference between them. The rules to be applied to the facts so found, in order to determine the new rate of duty, are prescribed by the statute. Congress may delegate to others a fact-finding power which the legislature may

rightfully exercise itself.   Although Congress cannot delegate its power to make the law, it can make a law delegating a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.   The rule of law prescribed by this statute is, that within the limits fixed in the statute, tariffs shall be adjusted to equalize the difference in the costs of production of foreign and domestic merchandise.

That in some case such costs may not be ascertainable, does not make the statute invalid, but merely renders it inoperative in the particular case.   That there may be difficulty in ascertaining the exact costs of production does not render it invalid.   Because of limits fixed by the statute upon changes in rates, exact costs of production are not necessary to be known in the majority of cases.   In them it is enough to know that the costs are not less in some cases or more in others than stated amounts.   The discretion left to the President under this statute is a discretion in matters of fact and in respect of the weight of evidence, and not as to the rules or principles to be applied.   *The Brig Aurora,* 7 Cranch 382; *Wayman* v. *Southard,* 10 Wheat. 1; *Field* v. *Clark,* 143 U. S. 649; *Miller* v. *Mayor of New York,* 109 U. S. 385; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Red " C " Oil Mfg. Co.* v. *North Carolina,* 222 U. S. 380; *Interstate Commerce Comm.* v. *Goodrich Transit Co.,* 224 U. S. 194; *Mutual Film Corp'n* v. *Ohio Industrial Comm.,* 236 U. S. 230; *Mutual Film Corp'n* v. *Kansas,* 236 U. S. 258; *United States* v. *Grimaud,* 220 U. S. 506.

It is too late in the day to question the power of Congress to protect American industry, through the operation of laws imposing duties on imports.   In the first session of the first Congress, the second law placed on the

statute books (Act of July 4, 1789, c. 2, 1 Stat. 24) declared that the duties there named were imposed not only for the support of the Government and to pay debts, but also for the encouragement and protection of manufacturers.

Congress has power not only to tax foreign commerce, but to regulate it. *Buttfield* v. *Stranahan,* 192 U. S. 492. See also *The Abby Dodge,* 223 U. S. 166; *Brolan* v. *United States,* 236 U. S. 216; *Weber* v. *Freed,* 239 U. S. 325; *Yee Hem* v. *United States,* 268 U. S. 178; *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320; *Strathearn S. S. Co.* v. *Dillon,* 252 U. S. 348.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

J. W. Hampton, Jr., & Company made an importation into New York of barium dioxide, which the collector of customs assessed at the dutiable rate of six cents per pound. This was two cents per pound more than that fixed by statute, par. 12, ch. 356, 42 Stat. 858, 860. The rate was raised by the collector by virtue of the proclamation of the President, 45 Treas. Dec. 669, T. D. 40216, issued under, and by authority of, § 315 of Title III of the Tariff Act of September 21, 1922, ch. 356, 42 Stat. 858, 941, which is the so-called flexible tariff provision. Protest was made and an appeal was taken under § 514, Part 3, Title IV, ch. 356, 42 Stat. 969–70. The case came on for hearing before the United States Customs Court, 49 Treas. Dec. 593. A majority held the Act constitutional. Thereafter the case was appealed to the United States Court of Customs Appeals. On the 16th day of October, 1926, the Attorney General certified that in his opinion the case was of such importance as to render expedient its review by this Court. Thereafter the judgment of the United States Customs Court was affirmed.

14 Ct. Cust. App. 350. On a petition to this Court for certiorari, filed May 10, 1927, the writ was granted, 274 U. S. 735. The pertinent parts of § 315 of Title III of the Tariff Act, ch. 356, 42 Stat. 858, 941 U. S. C., Tit. 19, §§ 154, 156, are as follows:

" Section 315(a). That in order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this Act intended, whenever the President, upon investigation of the differences in costs of production of articles wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties fixed in this Act do not equalize the said differences in costs of production in the United States and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this Act shown by said ascertained differences in such costs of production necessary to equalize the same. Thirty days after the date of such proclamation or proclamations, such changes in classification shall take effect, and such increased or decreased duties shall be levied, collected, and paid on such articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila) : *Provided,* That the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified in Title I of this Act, or in any amendatory Act. . . .

"(c). That in ascertaining the differences in costs of production, under the provisions of subdivisions (a) and (b) of this section, the President, in so far as he finds it practicable, shall take into consideration (1) the differ-

ences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition.

" Investigations to assist the President in ascertaining differences in costs of production under this section shall be made by the United States Tariff Commission, and no proclamation shall be issued under this section until such investigation shall have been made. The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard. The commission is authorized to adopt such reasonable procedure, rules, and regulations as it may deem necessary.

" The President, proceeding as hereinbefore provided for in proclaiming rates of duty, shall, when he determines that it is shown that the differences in costs of production have changed or no longer exist which led to such proclamation, accordingly as so shown, modify or terminate the same. Nothing in this section shall be construed to authorize a transfer of an article from the dutiable list to the free list or from the free list to the dutiable list, nor a change in form of duty. Whenever it is provided in any paragraph of Title I of this Act, that the duty or duties shall not exceed a specified ad valorem rate upon the articles provided for in such paragraph, no rate determined under the provision of this section upon such articles shall exceed the maximum ad valorem rate so specified."

The President issued his proclamation May 19, 1924. After reciting part of the foregoing from § 315, the proclamation continued as follows:

" Whereas, under and by virtue of said section of said act, the United States Tariff Commission has made an investigation to assist the President in ascertaining the differences in costs of production of and of all other facts and conditions enumerated in said section with respect to . . . barium dioxide, . . .

" Whereas in the course of said investigation a hearing was held, of which reasonable public notice was given and at which parties interested were given a reasonable opportunity to be present, to produce evidence, and to be heard;

"And whereas the President upon said investigation . . . has thereby found that the principal competing country is Germany, and that the duty fixed in said title and act does not equalize the differences in costs of production in the United States and in . . . Germany, and has ascertained and determined the increased rate of duty necessary to equalize the same.

" Now, therefore, I, Calvin Coolidge, President of the United States of America, do hereby determine and proclaim that the increase in the rate of duty provided in said act shown by said ascertained differences in said costs of production necessary to equalize the same is as follows:

" 'An increase in said duty on barium dioxide (within the limit of total increase provided for in said act) from 4 cents per pound to 6 cents per pound.

" ' In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

" ' Done at the City of Washington this nineteenth day of May in the year of our Lord one thousand nine hundred and twenty-four, and of the Independence of the

United States of America the one hundred and forty-eighth.

"' Calvin Coolidge.

"' By the President: Charles E. Hughes, Secretary of State.'"

The issue here is as to the constitutionality of § 315, upon which depends the authority for the proclamation of the President and for two of the six cents per pound duty collected from the petitioner. The contention of the taxpayers is two-fold—first, they argue that the section is invalid in that it is a delegation to the President of the legislative power, which by Article I, § 1 of the Constitution, is vested in Congress, the power being that declared in § 8 of Article I, that the Congress shall have power to lay and collect taxes, duties, imposts and excises. The second objection is that, as § 315 was enacted with the avowed intent and for the purpose of protecting the industries of the United States, it is invalid because the Constitution gives power to lay such taxes only for revenue.

First. It seems clear what Congress intended by § 315. Its plan was to secure by law the imposition of customs duties on articles of imported merchandise which should equal the difference between the cost of producing in a foreign country the articles in question and laying them down for sale in the United States, and the cost of producing and selling like or similar articles in the United States, so that the duties not only secure revenue but at the same time enable domestic producers to compete on terms of equality with foreign producers in the markets of the United States. It may be that it is difficult to fix with exactness this difference, but the difference which is sought in the statute is perfectly clear and perfectly intelligible. Because of the difficulty in practically determining what that difference is, Congress seems to have

doubted that the information in its possession was such as to enable it to make the adjustment accurately, and also to have apprehended that with changing conditions the difference might vary in such a way that some readjustments would be necessary to give effect to the principle on which the statute proceeds. To avoid such difficulties, Congress adopted in § 315 the method of describing with clearness what its policy and plan was and then authorizing a member of the executive branch to carry out this policy and plan, and to find the changing difference from time to time, and to make the adjustments necessary to conform the duties to the standard underlying that policy and plan. As it was a matter of great importance, it concluded to give by statute to the President, the chief of the executive branch, the function of determining the difference as it might vary. He was provided with a body of investigators who were to assist him in obtaining needed data and ascertaining the facts justifying readjustments. There was no specific provision by which action by the President might be invoked under this Act, but it was presumed that the President would through this body of advisers keep himself advised of the necessity for investigation or change, and then would proceed to pursue his duties under the Act and reach such conclusion as he might find justified by the investigation, and proclaim the same if necessary.

The Tariff Commission does not itself fix duties, but before the President reaches a conclusion on the subject of investigation, the Tariff Commission must make an investigation and in doing so must give notice to all parties interested and an opportunity to adduce evidence and to be heard.

The well-known maxim " *Delegata potestas non potest delegari,*" applicable to the law of agency in the general and common law, is well understood and has had wider

application in the construction of our Federal and State Constitutions than it has in private law. The Federal Constitution and State Constitutions of this country divide the governmental power into three branches. The first is the legislative, the second is the executive, and the third is the judicial, and the rule is that in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. *United States* v. *Grimaud,* 220 U. S. 506, 518; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Buttfield* v.

*Stranahan,* 192 U. S. 470; *In re Kollock,* 165 U. S. 526; *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320.

Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be effected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district. As Judge Ranney of the Ohio Supreme Court in *Cincinnati, Wilmington and Zanesville Railroad Co.* v. *Commissioners,* 1 Ohio St. 77, 88, said in such a case:

" The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." See also *Moers* v. *Reading,* 21 Penn. St. 188, 202; *Locke's Appeal,* 72 Penn. St. 491, 498.

Again, one of the great functions conferred on Congress by the Federal Constitution is the regulation of interstate commerce and rates to be exacted by interstate carriers for the passenger and merchandise traffic. The rates to be fixed are myriad. If Congress were to be required to fix every rate, it would be impossible to exercise the power at all. Therefore, common sense requires that in the fixing of such rates, Congress may provide a Com-

mission, as it does, called the Interstate Commerce Commission, to fix those rates, after hearing evidence and argument concerning them from interested parties, all in accord with a general rule that Congress first lays down, that rates shall be just and reasonable considering the service given, and not discriminatory. As said by this Court in *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194, 214, " The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress."

The principle upon which such a power is upheld in state legislation as to fixing railway rates is admirably stated by Judge Mitchell, in the case of *State* v. *Chicago, Milwaukee & St. Paul Railway Company,* 38 Minn. 281, 298 to 302. The learned Judge says on page 301:

" If such a power is to be exercised at all, it can only be satisfactorily done by a board or commission, constantly in session, whose time is exclusively given to the subject, and who, after investigation of the facts, can fix rates with reference to the peculiar circumstances of each road, and each particular kind of business, and who can change or modify these rates to suit the ever-varying conditions of traffic. . . . Our legislature has gone a step further than most others, and vested our commission with full power to determine what rates are equal and reasonable in each particular case. Whether this was wise or not is not for us to say; but in doing so we can not see that they have transcended their constitutional authority. They have not delegated to the commission any authority or discretion as to what the law

shall be,—which would not be allowable,—but have merely conferred upon it an authority and discretion, to be exercised in the execution of the law, and under and in pursuance of it, which is entirely permissible. The legislature itself has passed upon the expediency of the law, and what it shall be. The commission is intrusted with no authority or discretion upon these questions." See also the language of Justices Miller and Bradley in the same case in this Court. 134 U. S. 418, 459, 461, 464.

It is conceded by counsel that Congress may use executive officers in the application and enforcement of a policy declared in law by Congress, and authorize such officers in the application of the Congressional declaration to enforce it by regulation equivalent to law. But it is said that this never has been permitted to be done where Congress has exercised the power to levy taxes and fix customs duties. The authorities make no such distinction. The same principle that permits Congress to exercise its rate making power in interstate commerce, by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a rate-making body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise. If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power. If it is thought wise to vary the customs duties according to changing conditions of production at home and abroad, it may authorize the Chief Executive to carry out this purpose, with the advisory assistance of a Tariff Commission appointed under Congressional authority. This conclusion is amply sustained by a case in which there was no advisory commis-

sion furnished the President—a case to which this Court gave the fullest consideration nearly forty years ago. In *Field* v. *Clark,* 143 U. S. 649, 680, the third section of the Act of October 1, 1890, contained this provision:

" That with a view to secure reciprocal trade with countries producing the following articles, and for this purpose, on and after the first day of January, eighteen hundred and ninety-two, whenever, and so often as the President shall be satisfied that the government of any country producing and exporting sugars, molasses, coffee, tea and hides, raw and uncured, or any of such articles, imposes duties or other exactions upon the agricultural or other products of the United States, which in view of the free introduction of such sugar, molasses, coffee, tea and hides into the United States he may deem to be reciprocally unequal and unreasonable, he shall have the power and it shall be his duty to suspend, by ·proclamation to that effect, the provisions of this act relating to the free introduction of such sugar, molasses, coffee, tea and hides, the production of such country, for such time as he shall deem just, and in such case and during such suspension duties shall be levied, collected, and paid upon sugar, molasses, coffee, tea and hides, the product of or exported from such designated country as follows, namely: "

Then followed certain rates of duty to be imposed. It was contended that this section delegated to the President both legislative and treaty-making powers and was unconstitutional. After an examination of all the authorities, the Court said that while Congress could not delegate legislative power to the President, this Act did not in any real sense invest the President with the power of legislation, because nothing involving the expediency or just operation of such legislation was left to the determination of the President; that the legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What

the President was required to do was merely in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect.

Second. The second objection to § 315 is that the declared plan of Congress, either expressly or by clear implication, formulates its rule to guide the President and his advisory Tariff Commission as one directed to a tariff system of protection that will avoid damaging competition to the country's industries by the importation of goods from other countries at too low a rate to equalize foreign and domestic competition in the markets of the United States. It is contended that the only power of Congress in the levying of customs duties is to create revenue, and that it is unconstitutional to frame the customs duties with any other view than that of revenue raising. It undoubtedly is true that during the political life of this country there has been much discussion between parties as to the wisdom of the policy of protection, and we may go further and say as to its constitutionality, but no historian, whatever his view of the wisdom of the policy of protection, would contend that Congress, since the first revenue Act, in 1789, has not assumed that it was within its power in making provision for the collection of revenue, to put taxes upon importations and to vary the subjects of such taxes or rates in an effort to encourage the growth of the industries of the Nation by protecting home production against foreign competition. It is enough to point out that the second act adopted by the Congress of the United States, July 4, 1789, ch. 2, 1 Stat. 24, contained the following recital.

" Sec. 1. Whereas it is necessary for the support of government, for the discharge of the debts of the United States, and the encouragement and protection of manu-

factures, that duties be laid on goods, wares and mer-
chandises imported: Be it enacted, etc."

In this first Congress sat many members of the Consti-
tutional Convention of 1787. This Court has repeatedly
laid down the principle that a contemporaneous legisla-
tive exposition of the Constitution when the founders of
our Government and framers of our Constitution were
actively participating in public affairs, long acquiesced
in, fixes the construction to be given its provisions.
*Myers* v. *United States*, 272 U. S. 52, 175, and cases cited.
The enactment and enforcement of a number of customs
revenue laws drawn with a motive of maintaining a
system of protection, since the revenue law of 1789, are
matters of history.

More than a hundred years later, the titles of the Tariff
Acts of 1897 and 1909 declared the purpose of those acts,
among other things, to be that of encouraging the indus-
tries of the United States. The title of the Tariff Act of
1922, of which § 315 is a part, is "An Act to provide reve-
nue, to regulate commerce with foreign countries, to en-
courage the industries of the United States and for other
purposes." Whatever we may think of the wisdom of a
protection policy, we can not hold it unconstitutional.

So long as the motive of Congress and the effect of its
legislative action are to secure revenue for the benefit of
the general government, the existence of other motives
in the selection of the subjects of taxes can not invalidate
Congressional action. As we said in the *Child Labor Tax
Case*, 259 U. S. 20, 38: " Taxes are occasionally imposed
in the discretion of the legislature on proper subjects with
the primary motive of obtaining revenue from them, and
with the incidental motive of discouraging them by mak-
ing their continuance onerous. They do not lose their
character as taxes because of the incidental motive."

And so here, the fact that Congress declares that one of its motives in fixing the rates of duty is so to fix them that they shall encourage the industries of this country in the competition with producers in other countries in the sale of goods in this country, can not invalidate a revenue act so framed. Section 315 and its provisions are within the power of Congress. The judgment of the Court of Customs Appeals is affirmed.

*Affirmed.*