1997 SD 34

**John W. BOEVER, Plaintiff and Appellant,**

v.

**SOUTH DAKOTA BOARD OF ACCOUNTANCY and Casey Peterson, Chairman of the South Dakota Board of Accountancy, Defendants and Appellees.**

No. 19415.

Supreme Court of South Dakota.

Considered on Briefs May 21, 1996.

On Reassignment Dec. 16, 1996.

Decided March 26, 1997.

---

Michael M. Billion of Woods, Fuller, Shultz & Smith Sioux Falls, for plaintiff and appellant.

Mark Barnett, Attorney General, Sherri Sundem Wald, Assistant Attorney General, Pierre, for defendants and appellees.

GILBERTSON, Justice (on reassignment).

[¶ 1.] John W. Boever (Boever) appeals the judgment of the circuit court upholding the constitutionality of SDCL 36–20A–15, which

empowers the South Dakota Board of Accountancy (Board) to promulgate rules governing quality reviews of public accounting firms. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] A detailed recitation of the facts leading to this appeal is set forth in *Boever v. South Dakota Bd. of Accountancy*, 526 N.W.2d 747 (S.D.1995) (*Boever I* ), and will not be repeated herein. Boever is a certified public accountant, licensed under SDCL Ch. 36–20A. In June 1990, Boever's work was reviewed and eighteen problems were identified as a result. A second quality review also identified problems with Boever's work. The Department of Legislative Audit also filed a complaint against Boever alleging five other deficiencies with his work.

[¶ 3.] On June 30, 1992, the Board filed a notice of hearing alleging Boever had violated several administrative rules governing the practice of public accounting. Upon Boever's agreeing to all but one of the enumerated violations, the Board allowed Boever to retain his license to continue practicing as a public accountant.

[¶ 4.] On September 2, 1993, Boever filed a declaratory judgment action challenging the constitutionality of SDCL 36–20A–15, which delegates to the Board the authority to promulgate rules and regulations regarding quality reviews of public accounting firms, and 36–20A–20(9), which provides for the discipline of accountants based on certain enumerated reasons. Following a hearing, the trial court granted the Board's motion for summary judgment based on lack of ripeness.

[¶ 5.] On appeal, this Court affirmed as to SDCL 36–20A–20(9), holding that since Boever had not been disciplined, there was no real, present or imminent controversy. However, we reversed and remanded the circuit court's decision pertaining to SDCL 36–20A–15, holding that the matter was sufficiently ripe to consider a declaratory judgment action since conflict between Boever and the Board regarding future quality reviews was imminent and inevitable. *Boever I*, 526 N.W.2d at 750.

[¶ 6.] On remand, the circuit court held SDCL 36–20A–15 was not an unconstitutional delegation of legislative power, and did not violate Boever's due process rights. Boever challenges both rulings.

## STANDARD OF REVIEW

[¶ 7.] Our review of a constitutional challenge to a statute is de novo. *Green v. Siegel, Barnett & Schutz*, 1996 SD 146, ¶ 7, 557 N.W.2d 396, 398.

> There is a strong presumption that the laws enacted by the legislature are constitutional and the presumption is rebutted only when it clearly, palpably and plainly appears that the statute violates a provision of the constitution. Further, the party challenging the constitutionality of a statute bears the burden of proving beyond a reasonable doubt that the statute violates a state or federal constitutional provision.

*Id.* (quoting *State v. Hauge*, 1996 SD 48, ¶ 14, 547 N.W.2d 173, 175); *accord Kyllo v. Panzer*, 535 N.W.2d 896, 898 (S.D.1995); *Simpson v. Tobin*, 367 N.W.2d 757, 765 (S.D. 1985).

## ANALYSIS AND DECISION

[¶ 8.] **1. Whether SDCL 36–20A–15 is an unconstitutional delegation of legislative authority?**

[¶ 9.] SDCL 36–20A–15 was enacted by the South Dakota Legislature in 1984 and grants authority to the South Dakota Board of Accountancy to promulgate rules and regulations regarding the quality review of public accounting firms. The statute provides, in relevant part, that:

> The Board may by rule promulgated pursuant to chapter 1–26 require, on either a uniform or a random basis, as a condition to renewal of firm permits pursuant to § 36–20A–14, that applicants undergo quality reviews conducted in such manner and *producing such satisfactory result as the Board may specify.* However, any such requirement shall include reasonable provision for compliance by means of an applicant furnishing evidence of a satisfac-

tory quality review performed for other purposes.

(emphasis added). Based on the authority provided it by this statute, the Board enacted various rules and regulations relating to an accounting firm's successful completion of the quality review program. Boever claims that the Legislature, by the language emphasized above, unconstitutionally delegated its rule-making authority in that it failed to provide sufficient guidelines or standards to guide the Board.

[¶ 10.] Our state constitution mandates that "[t]he legislative power of the State shall be vested in a Legislature...." SD Const. Art III, § 1. It is a fundamental principle of our law that the Legislature is prohibited from abdicating "its essential power to enact policies into law," or from delegating such power "to any other department or body." *First Nat'l Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709, 718 (S.D.1986). However, it is equally as fundamental that quasi-legislative power may be delegated by the Legislature to administrative agencies in order to execute or carry out existing legislation. *In re Application No. 5189–3*, 467 N.W.2d 907, 913 (S.D.1991); *Oahe Conservancy Subdistrict v. Janklow*, 308 N.W.2d 559, 563 (S.D.1981); *Boe v. Foss*, 76 S.D. 295, 77 N.W.2d 1, 11 (1956). Such a delegation is proper when accompanied by "(1) a clearly expressed legislative will to delegate power, and (2) a sufficient guide or standard to guide the agency." *Application No. 5189–3*, 467 N.W.2d at 913 (citing *First Nat'l Bank of Minneapolis*, 394 N.W.2d at 718; *In re Ackerson, Karlen & Schmitt*, 335 N.W.2d 342, 345 (S.D.1983)).

[¶ 11.] It is beyond argument that the State of South Dakota has a legitimate interest for the protection of its citizens to regu-

late the profession of public accountancy including licensing and supervisory powers which naturally must include the power to discipline or exclude the unqualified. *Appeal of Schramm*, 414 N.W.2d 31, 34 (S.D.1987). "In addition to its general interest in protecting consumers and regulating commercial transactions, the state bears a special responsibility for maintaining standards among members of the licensed professions." *Id.* (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978)).[1]

[¶ 12.] To regulate the practice of public accountancy, the Legislature did not pass a single statute, but a full chapter, containing thirty-five separate statutes. The goal of the chapter is found in SDCL 36–20A–2 which views this chapter as regulating public accountancy so that it offers the public:

> the performance or the offering to perform, for a client or potential client, of one or more kinds of services involving the use of accounting or auditing skills, including the issuance of reports on financial statements, or of one or more kinds of management advisory or consulting services, or the preparation of tax returns or the furnishing of advice on tax matters.[2]

This statutory mandate is enforced by a Board of Accountancy. SDCL 36–20A–3. In order to regulate this profession, any who wish to practice it must obtain a certificate of public accountancy (SDCL 36–20A–8) and a permit which is subject to annual renewals. SDCL 36–20A–10.

[¶ 13.] Renewals are not automatic. The applicant must comply with requirements for continuing professional education. SDCL 36–20A–12. In addition, the Board may refuse a renewal for a violation of any one of

---

1. The facts of this case point out clearly the need for protection of the public interest by regulation of this profession. We stated in *Boever I*, 526 N.W.2d at 748–49:

    In June of 1990 Boever's quality review identified eighteen problems with his work ... The second quality review also identified problems. In addition to those problems, the South Dakota Department of Legislative Audit (DLA) filed a complaint against Boever. The DLA complaint alleged five other deficiencies with Boever's accounting and auditing work.... Boe-

ver admitted all but one of the underlying allegations and he entered into a consent agreement with the Board on August 20, 1992.

2. Compare this specific definition with *National Broadcasting Co. v. United States*, 319 U.S. 190, 217–227, 63 S.Ct. 997, 1010–14, 87 L.Ed. 1344, 1363–1368 (1943), where a Congressional delegation to the Federal Communications Commission was upheld under a "as public interest, convenience or necessity" require, standard of delegation.

ten professional requirements including "(10) [d]ishonesty or gross negligence in the performance of quality reviews." SDCL 36–20A–20.[3] The Legislature did not leave any doubt what it meant when it made reference to a "quality review." It specifically defined it in SDCL 36–20A–1(6) as "a study, appraisal or review by a licensee of this state or a person holding a certificate of any state, of one or more aspects of the professional work of a person or firm in the practice of public accountancy."

[¶ 14.] Pursuant to SDCL 36–20A–15, the Legislature granted the Board the following authority which is now under constitutional challenge,

> The Board may by rule promulgated pursuant to chapter 1–26 require, on either a uniform or a random basis, as a condition to renewal of firm permits pursuant to § 36–20A–14, that applicants undergo quality reviews conducted in such manner and producing such satisfactory result as the Board may specify.

*See also* SDCL 36–20A–7(9) which authorizes the Board to adopt "rules regarding quality review pursuant to § 36–20A–15." Additional legislative guidance is to be found in

SDCL 36–20A–33 wherein the Board is granted the authority to require attendance at a quality review seminar and/or to require the purchase of a quality review manual prior to the quality review itself.

[¶ 15.] As long as the Legislature provides a sufficient guide, standard or intelligible principle to the agency to direct the exercise the delegated authority, this does not constitute a forbidden delegation of legislative power. *Application No. 5189–3,* 467 N.W.2d at 913, *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714, 730–31 (1989).[4] In determining what the Legislature may constitutionally do in seeking the assistance from another branch of government by delegation, "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government coordination." *Mistretta,* 488 U.S. at 372, 109 S.Ct. at 654–55, 102 L.Ed.2d 714, 730 (citing *J.W. Hampton Jr. & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)).

[¶ 16.] We have held that in ascertaining whether this sufficient guidance exists is a question that requires a review of all relevant

---

3. Clearly the Legislature did not intend to rely solely on quality reviews as a basis for the granting or denying of a permit. The Legislature enacted a comprehensive set of criteria for that basis:

    (1) Fraud or deceit in obtaining certificate or permit;
    (2) Cancellation, revocation, suspension, or refusal to renew authority to engage in the practice of public accountancy in any other state for any cause;
    (3) Failure, on the part of a holder of a permit pursuant to § 36–20A–10, 36–20A–11, or 36–20A–14, to maintain compliance with the requirements for issuance or renewal of such permit or to report changes to the Board pursuant to § 36–20A–13 or 36–20A–16;
    (4) Revocation or suspension of the right to practice before any state or federal agency;
    (5) Dishonesty or gross negligence in the practice of public accountancy or in the filing or failure to file personal income tax returns;
    (6) Violation of any of the provisions of this chapter or rules promulgated pursuant to chapter 1–26 by the Board under this chapter;
    (7) Conviction of a felony or of any crime, an element of which is dishonesty or fraud, under the laws of any state or the United States;

    (8) Performance of any fraudulent act while holding a certificate or permit;
    (9) Any conduct reflecting adversely upon the licensee's fitness to engage in the practice of public accountancy; and
    (10) Dishonesty or gross negligence in the performance of quality reviews.

4. In *Yakus v. United States,* 321 U.S. 414, 420, 64 S.Ct. 660, 665, 88 L.Ed. 834, 846 (1944), the Court upheld as constitutional a delegation from Congress to an administrator which empowered that administrator "to promulgate regulations fixing prices of commodities which 'in his judgment will be generally fair and equitable and will effectuate the purposes of this Act' " where, in the administrator's judgment, these prices " 'have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act.' "

    In *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Court upheld the constitutionality of a statute which stated: "the Secretary of State may grant and issue passports ... under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports." *Id.* at 7–8, 85 S.Ct. at 1276, 14 L.Ed.2d at 185.

statutes and not just examining in isolation the one supposedly offending statute. In *Application No. 5189–3*, we upheld a delegation of rule-making authority to the Water Management Board under a standard of "due to other exigent circumstances identified by the water management board." *Id.* at 913. In doing so, we did not look to the obviously limited extent of the challenged statutory text, but rather relied upon the general policy of water usage as established by numerous other statutes. *Id.*[5] Therein, the statute did not even define what constituted "exigent circumstances" while in the case now before us, SDCL 36–20A–1(6) defines a "quality review." *See also SD Migratory Bird Ass'n v. SD G, F & P*, 312 N.W.2d 374, 375 (S.D. 1981) (wherein we upheld an administrative regulation banning lead shotgun pellets based on a statutory authorization that, "the department of game, fish and parks shall have the power to regulate ... in every practical manner under the laws of this state, ... the hunting, taking or killing of all game ... except as otherwise provided by statute....").

[¶ 17.] An additional consideration is the nature of what is being sought to be regulated.

> Applying this 'intelligible principle' test to congressional delegations, our jurisprudence has been driven by a practical understanding that in our increasingly com-plex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.

*Mistretta*, 488 U.S. at 372, 109 S.Ct. at 655, 102 L.Ed.2d at 731.[6]

[¶ 18.] Accountancy is an exacting profession. Its specific requirements to achieve and maintain that status are properly left to the domain of its professional supervisory board after receiving appropriate policy standards from the legislature. *Affiliated Distillers Brands Corp. v. Gillis*, 81 S.D. 44, 45, 130 N.W.2d 597, 599 (1964). The above statutes show a sufficient legislative intent to protect the public interest by a peer review board requiring renewal affirmations of an accountant's expertise in that profession in part through the use of a quality review program. If the contrary were correct, the next step mandated of the Legislature in order to pass constitutional muster would be to require it to enact highly specific requirements for each regulated profession which are more appropriate to administrative regulations. Must the Legislature now expend its valuable time in pursuit of the adoption of statutes so specific that they are comprehensible only by those who practice in that profession? *See* ARSD 20:37:13:09, the administrative rules implementing the quality review program.[7] In the execution of its public

---

5. In *Boe v. Foss*, 76 S.D. 295, 77 N.W.2d 1 (1956), we upheld a delegation of legislative authority under a "consistent and necessary" standard. We held that this standard was specific enough when "read in connection with some facts which are commonly known." *Boe*, 76 S.D. at 316, 77 N.W.2d at 13. *See also Zemel*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179.

6. In referring to the "intelligible principle," the *Mistretta* Court quoted from *J.W. Hampton, Jr. & Co.*, 276 U.S. at 406, 48 S.Ct. at 351, 72 L.Ed. 624, explaining the Court's approach to the separation of powers principle and the non-delegation doctrine in particular:

> So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'

*Mistretta*, 488 U.S. at 372, 109 S.Ct. at 655, 102 L.Ed.2d at 730.

7. ARSD 20:37:13:09 provides the following rules for conducting this review:

> The quality review must be conducted at the office location of the firm under review unless the board gives prior approval for the review to be conducted at another location. In granting approval for a review to be conducted at another location, the board shall consider firm size and makeup, the number and types of engagements, distances involved, and prior review.
> The quality review must be conducted in accordance with the following requirements:
> (1) A review must cover a firm's accounting and auditing practice and its related quality control system;
> (2) The review must be conducted between June 1 and October 31 of the year of review unless otherwise agreed by the board and the firm subject to review;
> (3) The reviewer must select the engagements to be reviewed. The engagements must cover between five and ten percent of the firm's

policy, the Legislature can call to its aid boards to do that which it could not conveniently do for itself. *Boe,* 76 S.D. at 314, 77 N.W.2d at 13.

> The theory of administrative rule making is that in certain fields and in some respects the public interest is better served by delegating a large part of detailed law making to expert administrators, controlled by policies, objects and standards laid down by the legislature, rather than having all of the details spelled out through the traditional legislative process.

*Affiliated Distillers Brands Corp.,* 81 S.D. at 48, 130 N.W.2d at 599.

[¶ 19.] The multiple nature of possible violations require a specific regulatory response that can be more effectively and efficiently tailored and modified by a peer review board via regulations and specific quality reviews of an individual accountant's work, rather than by the much more cumbersome legislative enactment process. "It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of· a program." *Lichter v. United States,* 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694, 1726 (1948).

[¶ 20.] In the examination of this type of question, "[t]he Constitution as a continuously operative charter of government does not demand the impossible or the impracticable." *Yakus,* 321 U.S. at 424, 64 S.Ct. at 667, 88 L.Ed. at 848. For the reasons set forth above, we conclude that SDCL 36–20A–15 and 36–20A–7(9) constitute a valid delegation of legislative authority to the Board of Public Accountancy when considered with the entire contents of SDCL 36–20A and its stated purpose of regulating the profession for the protection of the public.

**[¶ 21.] 2. Whether SDCL 36–20A–15 is an unconstitutional violation of Boever's due process rights?**

■ [¶ 22.] Boever's claim that SDCL 36–20A–15 violates due process as it is unconstitutionally vague is without merit. Persons of common intelligence do not need to guess at its meaning or differ as to its application. *Americana · Healthcare Center v. Randall,* 513 N.W.2d 566, 574 (S.D.1994). Boever admits as much in his brief to this Court wherein he states, "SDCL 36–20A–7(9) and SDCL 36–20A–15 are clear and unambiguous."

[¶ 23.] We affirm.

[¶ 24.] MILLER, C.J., and KONENKAMP, JJ., concur.

---

accounting and auditing practice hours. If the reviewed firm has one or more audits conducted pursuant to the Government Auditing Standards or the Employee Retirement Income Security Act of 1974, at least one of those engagements must be selected. Because of the special considerations involved, greater weight must be given to selecting the following types of engagements:

    (a) Those in which there is a significant public interest, such as financial institutions and brokers or dealers in securities; and

    (b) Those which are large, complex, or high risk or that are the reviewed firm's initial audits of clients;

(4) At least one audit of a federally insured depository institution engagement with more than $500 million in total assets subject to Section 36 of the Federal Deposit Insurance Act as in effect on September 1, 1994, must be included in the scope of the review if the review is intended to satisfy the requirement established by the Federal Deposit Insurance Corporation Improvement Act of 1991 as in effect on September 1, 1994. These requirements are contained in 12 C.F.R. Part 363 as published in 58 Fed.Reg. 31,332 to 31,341, inclusive (June 2, 1993).

(5) The review must be limited to the reviewed firm's quality control system and the accounting and auditing engagements with client year ends dated within the year under review;

(6) The reviewer must use checklists provided by the board as a basis for performing the review unless reviewing under § 20:37:13:06. A separate checklist must be used for the quality control system, audits, reviews, and compilations. The checklists must include questions for the reviewer to answer and must provide sufficient information for the board to determine whether the firm under review complies with the standards and principles in §§ 20:37:11:07 and 20:37:11:08; and;

(7) The firm under review must submit to the reviewer the prior quality review report; the letter of comments, if any; the reviewed firm's response to the letter of comments, if any; the final letter of approval; and any board or review committee performance requirements.

[¶ 25.] LEE D. ANDERSON, Circuit Judge, concurs in part and dissents in part.

[¶ 26.] SABERS, J., dissents.

[¶ 27.] LEE D. ANDERSON, Circuit Judge, sitting for AMUNDSON, J., disqualified.

LEE D. ANDERSON, Circuit Judge (dissenting in part, concurring in part).

[¶ 28.] I respectfully dissent. I do not agree that the legislature has provided sufficient guidelines or standards to guide the Board in exercising its delegated power.

[¶ 29.] The majority asserts that to hold SDCL 36–20A–15 unconstitutional would be to require "highly specific" enactments that are "so specific that they [would be] comprehensible only by those who practice in that profession." On the contrary, the legislature could have readily included in the statutory scheme some guidelines similar to those contained in the Board's administrative rules which implemented the quality review program. For example, ARSD 20:37:13:09 requires a determination of whether the firm under review has complied with the auditing, accounting, and review standards set forth in ARSD 20:37:11:07, and accounting principles under ARSD 20:37:11:08.

[¶ 30.] Had the legislature set forth guidelines similar to those contained in the above-cited regulations and described, even in general terms, what would constitute a satisfactory result, I would agree that SDCL 36–20A–15 should be upheld. However, in enacting SDCL 36–20A–15, the legislature has left the field completely undefined as to the types of rules that may be enacted by the Board in determining what is a satisfactory result. This makes it impossible to determine whether the will of the legislature, in creating the quality review program, has been obeyed.

[¶ 31.] In *Affiliated Distillers Brands Corp. v. Gillis,* this Court recognized:

The theory of administrative rule making is that in certain fields and in some respects the public interest is better served by delegating a large part of detailed law making to expert administrators, controlled by policies, objectives and standards laid down by the legislature, rather than having all the details spelled out through the traditional legislative process.

81 S.D. 44, 45, 130 N.W.2d 597, 599 (1964). While public accountancy may be such a field and, as the majority has observed, South Dakota may have a "legitimate interest for the protection of its citizens to regulation the profession of public accountancy," it remains incumbent upon the legislature to control the Board's exercise of its authority by setting forth at least some standards and guidelines. The principle underlying this requirement may be stated as follows: The legislature must provide, within the statutory scheme, safeguards against the absolute, undefined, and unbounded discretion of the board, agency, or other delegate, so that it may be ascertained whether the delegate is acting in conformity with the will of the legislature. *See Affiliated Distillers,* 81 S.D. at 45, 46, 130 N.W.2d at 599, 600; *Wall v. Fenner,* 76 S.D. 252, 76 N.W.2d 722, 724 (1956); *Yakus v. United States,* 321 U.S. 414, 425, 64 S.Ct. 660, 667, 88 L.Ed. 834, 849 (1944); *Ralston Purina Co. v. Hagemeister,* 188 N.W.2d 405, 407 (N.D.1971).

[¶ 32.] Standards and guidelines serve as safeguards by indicating the outer bounds of the delegated authority. *See Yakus,* 321 U.S. at 425, 64 S.Ct. at 667, 88 L.Ed. at 849. Where there is a lack of standards for the direction of the Board's action, it becomes impossible to determine whether the will of the legislature has been followed. *See Id.* In such instances the agency or board has, in essence, been granted unfettered discretion to set legislative policy. This, under our Constitution, cannot be done, regardless of how reasonable the delegation appears.

[¶ 33.] It is true that in determining whether sufficient guidelines or standards are present, we are to examine other legislative enactments dealing with the same subject, as well as the challenged statute. *See Application No. 5189–3,* 467 N.W.2d at 913; *Boe v. Foss,* 76 S.D. 295, 77 N.W.2d 1, 13 (1956). However, in applying this line of analysis, I believe the majority has failed to remain focused upon the issue of quality review and, more specifically, the asserted constitutional defect of SDCL 36–20A–15: "producing such

*satisfactory results as the board may specify.
...."*

[¶ 34.] The majority cites a number of sections from SDCL ch. 36–20A, claiming that they "provide the sufficient guide, standard, or intelligible principle to the agency to direct the exercise [of] the delegated authority." However, none of the statutes which are relied upon by the majority provide the Board with guidance in deciding what *satisfactory results* of a quality review shall be, much less indicate to the public, the legislature or the courts the outer bounds of the delegated authority.

[¶ 35.] Likewise, the case law cited by the majority is distinguishable from the present case. In *Application No. 5189–3,* the Court upheld SDCL 46–5–26(3), which allowed for the extension of construction periods for delay due to *"other* exigent circumstances." 467 N.W.2d at 913 (emphasis added). The

Court reasonably determined that by using the word "other" in subsection (3), the legislature was relating back to the "other predicates enumerated in the statute," *i.e.,* the circumstances described in subsections (1) and (2), thereby providing sufficient guidance in interpreting the phrase "exigent circumstances." *Id.* In the instant case, the term "satisfactory" is entirely subjective, and there is no similar language in chapter 36–20A to guide the Board in determining what is a satisfactory result. In *Yakus,* the statutory scheme provided extensive statements of the legislative policies behind the enactments, against which the propriety of the administrator's actions could be measured.[8] No such provision is found in ch. 36–20A. Finally, while the Court in *Boe* aptly set forth the legal principles which are to guide our analysis, its application of those principles is questionable at best.[9] As such, very

---

8. In *Yakus,* the challenged statute mandated that the Administrator exercise his authority to fix prices in a manner which would "effectuate the purposes of [the] Act", which had been set forth by the legislature as follows:

"to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, ... and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; ...."
321 U.S. at 420, 64 S.Ct. at 665, 88 L.Ed. at 846 (citation omitted). The legislature further directed:

"So far as practicable, in establishing any maximum price the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941, (or if, in the case of any commodity, there are no prevailing prices between such dates, or the prevailing prices between such dates are not generally representative because of abnormal or seasonal market conditions or other cause, then to the prices prevailing during the nearest two-week period in which, in the judgment of the Administrator, the prices

for such commodity are generally representative) ... and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, including.... Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941."
*Id.* at 421, 64 S.Ct. at 665–666, 88 L.Ed. at 846 (citation omitted).

9. In *Boe,* the statute at issue authorized the Board of Regents to construct apartment housings and dormitories on the grounds of the institutions which it controlled whenever the Board of Regents deemed such facilities *"necessary and feasible ...."* 77 N.W.2d at 13 (emphasis added) (citation omitted). In upholding the delegation, the Court *created* the necessary guidance which the statutory scheme was lacking, stating:

The first impression is that it granted a broad discretion to the Board in very general terms. Reflection however will impel the conclusion that the powers granted are operative in a very limited field. Before action can be taken the facts must reveal that a particular structure is "necessary" and "feasible." These standards are neither difficult to understand nor apply. *Whether the structure is "necessary" depends on the relationship of the firm student population at the particular institution to the available acceptable housing in existing dormitories and in the community. The feasibility of that structure will depend on whether the revenue it will produce at rates students can and should pay will be sufficient to induce investors to supply the capital to bring it into being.*

little is gained by comparing SDCL 36–20A to the legislation which was salvaged in *Boe.*

[¶ 36.] By upholding this statute as constitutional, the majority is recognizing in the Board the absolute and unbounded discretion to determine what a satisfactory result shall be. "The presumption that [the Board] will not act arbitrarily but will exercise sound judgment and good faith cannot sustain a delegation of unregulated discretion." *Affiliated Distillers,* 130 N.W.2d at 600.

[¶ 37.] I agree with the majority's holding on Issue 2 that SDCL 36–20A–15 is not an unconstitutional violation of Boever's due process rights.

SABERS, Justice (dissenting).

[¶ 38.] I join Judge Anderson's dissent because these statutes wholly fail to establish an (1) objective (2) standard (3) set by the legislature.

[¶ 39.] To pass constitutional muster concerning delegation of legislative authority, statutes must provide an (1) objective (2) standard (3) established by the legislature. A failure in any one respect is fatally defective to their constitutionality and these statutes fail in all three respects.

[¶ 40.] Instead of an objective standard set by the legislature, these statutes merely provide for "quality review" by a board to "produce such satisfactory results as the board may specify." The three defects are obvious.

[¶ 41.] First, the statute merely provides for "quality review," which is a process, not a standard. Second, instead of an objective test, the statutes call for "satisfactory results as the board may specify," which is a subjective test. Finally, this legislation provides that the improper subjective test is to be performed by the board rather than set by the legislature as required.

[¶ 42.] Compare *Cary v. City of Rapid City,* 1997 SD 18, ¶ 23, 559 N.W.2d 891, where we recently stated:

> The ultimate determination of the public's best interest is for the legislative body, not a minority of neighboring property owners. Delegations of legislative authority which

allow this ultimate decision to be made by a minority of property owners without an opportunity for review are unlawful.

(Citation omitted). Likewise, delegations of legislative authority which allow this ultimate decision to be made by a "quality review" board without objective standards, are unlawful. We should reverse.